AURORA WORLD, INC., Plaintiff,

v.

TY INC., Defendant.

Case No. CV 09–08463 MMM (Ex).

United States District Court,
C.D. California.

Dec. 15, 2009.

Raymond B. Kim, Vincent Henry Chieffo, Wendy M. Mantell, Courtney J. Chai, Greenberg Traurig LLP, Robert L. Meylan, Shaunt T. Arevian, Murphy Rosen & Meylan LLP, Santa Monica, CA, for Plaintiff.

J. Aron Carnahan, James P. White, Laurie A. Haynie, Husch Blackwell Sanders Welsh & Katz LLP, Scott E. Rogers, Scandaglia & Ryan LLP, Chicago, IL, Glenn W. Trost, Connolly Bove Lodge & Hutz LLP, Los Angeles, CA, for Defendant.

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

MARGARET M. MORROW, District Judge.

Plaintiff Aurora World, Inc. commenced this action on November 17, 2009, alleging copyright and trademark infringement, as well as state law unfair competition and misappropriation claims.[1] Shortly thereafter on November 19, 2009, plaintiff filed a motion for preliminary injunction, which if granted would enjoin defendant Ty Inc. from selling or marketing its line of Beanie Boo dolls.[2] On December 2, 2009, Ty op-

1. Complaint for 1) Violations of the Copyright Act, 17 U.S.C. §§ 101 et seq.; 2) Violations of the Lanham Act, 15 U.S.C. §§ 1051 et seq.; 3) Violations of the California Business & Professions Code §§ 17200 et seq.; 4) Common Law Misappropriation; 5) Common Law Unfair Competition ("Complaint"), Docket No. 1 (Nov. 17, 2009).

2. Aurora World, Inc.'s Notice of Motion and Motion for Preliminary Injunction; Memo-

randum of Points and Authorities ("Motion"), Docket No. 5 (Nov. 19, 2009). See also Aurora World, Inc.'s Reply in Support of Motion for Preliminary Injunction ("Reply"), Docket No. 26 (Dec. 7, 2009). Plaintiff also filed on November 19, 2009 an ex parte application to set specially the hearing date in this matter for December 14, 2009, (Ex Parte Application to Specially Set December 14, 2009 Hearing Date on Plaintiff Aurora World, Inc.'s Motion for Preliminary Injunction, Docket No. 9

posed plaintiff's motion.[3]

## I. FACTUAL BACKGROUND

Aurora is one of the world's leading manufacturers of soft toys in the global gift industry.[4] In or before January 2007, Aurora launched its YooHoo & Friends brand of plush toy characters. In addition to these stuffed toys, Aurora has created a virtual world (i.e., an interactive website) called YooHoo & Friends that is populated by characters known as the "YooHoos." The YooHoos are animals, many of which are endangered species.[5] Plaintiff asserts that the plush toys "possess a distinctive look and feel, characterized by large heads, specially-tooled and designed large round eyes with large black pupils and colored borders, and recognizable stitching patterns, expressions, and color ele-

ments."[6] YooHoo & Friends products include the website, a catalog, an animated series currently airing in Korea, and the plush toys, together with peripheral items such as notepads, pins, and keychains. YooHoo & Friends products have been sold in Korea, the United Kingdom, and Saudi Arabia, as well as in the United States and other countries. Aurora is currently pursuing co-marketing opportunities with several nationwide retail and restaurant chains and recreation sites in the United States.[7] The complaint alleges that since launching the YooHoo & Friends brand, Aurora has expended substantial time, energy, and effort creating and promoting the brand internationally. YooHoo & Friends plush toys have generated millions of dollars in revenue worldwide,[8] and Aurora has applied for or obtained copyrights in at least some of the YooHoo & Friends characters.[9]

(Nov. 19, 2009).), which application the court granted on November 20, 2009, (Minute Order, Docket No. 10 (Nov. 20, 2009).).

3. Defendant Ty Inc.'s Opposition to Plaintiff's Motion for Preliminary Injunction ("Opp."), Docket No. 18 (Dec. 2, 2009).

4. Complaint, ¶¶ 2, 7.

5. *Id.*, ¶ 8. Aurora's director of product development provides the following timeline for the development and marketing of YooHoo & friends. In the spring of 2006, Aurora began to develop the YooHoo & Friends line of plush toys. The line was developed and created by Aurora designers in Seoul, Korea. Aurora unveiled prototypes of the plush toy products at the Atlanta Gift Show in Georgia in July 2006. In April 2008, Aurora launched a promotional website, located at www.yoohoofriends.com. The website introduced the characters and provided a background story for each; it also offers interactive games and other attractions. (Declaration of Monica Fitzhugh in Support of Aurora World, Inc.'s Motion for Preliminary Injunction ("Fitzhugh Decl."), Docket No. 7 (Nov. 19, 2009).)

6. Motion at 1.

7. Complaint, ¶ 9.

8. *Id.*, ¶ 13. As of November 2009, retail sales of Aurora's YooHoo & Friends products totaled $4.0 million for the year; 2008 retail sales totaled $3.0 million. (Declaration of Michael Kessler in Support of Aurora World, Inc.'s Motion for Preliminary Injunction ("Kessler Decl."), Docket No. 6 (Nov. 19, 2009), ¶ 9.) Aurora has not proffered separate sale figures for the U.S. market.

9. *Id.*, ¶ 12. On March 12, 2007, Aurora obtained copyright registration VA1–406–420 for the YooHoo bush baby plush toy. (Fitzhugh, Decl., Exh. E.) Based on plaintiff's exhibits, it appears that on October 29, 2007, it obtained a registration for a Valentine's Day variation of the bush baby plush toy (VA1–628–222); that on November 19, 2007 it obtained a registration for a Graduation Day variation of the bush baby plush toy (VA1–631–368); and that on February 22, 2008 it obtained a registration for a clip-on keychain and a puppet of the bush baby plush toy (VA1–640–398, VA1–640–401). (*Id.*, Exh. F.) On February 22, 2008, Aurora obtained copyright registration VA1–640–404 for the YooHoo & Friends lemur plush toy with sound. (*Id.*) On March 4, 2008, it obtained copyright registration VA1–664–220 for the YooHoo & Friends fennec plush toy with sound; copyright registration VA1–664–194 for the capuchin plush toy with sound; and copyright

Ty is a direct competitor of Aurora in the plush toy market. Aurora alleges that at some point in 2009, Ty released a line of plush animal toys called the Beanie Boos.[10] Since their release, Ty has sold six Beanie Boo products in the United States: Kooky the Koala (item number 36001), Kiwi the Frog (item number 36004), Bamboo the Panda (item number 36005), Waddles the Penguin (item number 36008), Coconut the Monkey (item number 36003), and Slush the Husky Dog (item number 36006).[11] In addition, Ty has developed two Beanie Boos, named Cleo the Bush Baby and Bubblegum the Lemur.[12] Ty asserts these toys have been sold in Europe and Canada only; that they are not currently listed on any order form Ty uses in the United States; that they are not currently depicted on Ty's website; and that Ty has no intention of selling or offering them for sale in the United States pending final resolution of this lawsuit.[13]

Aurora contends that a "side-by-side comparison of the plush animals and the facts of this case clearly reveal" that the Beanie Boos are "remarkably similar" to Aurora's YooHoo & Friends.[14] In this regard, it identifies the distinctive features of YooHoo & Friends "are … large, round eyes, with large black pupils and colored borders …. placed close together on the front of each character's face," and "recognizable stitching patterns, expressions, and color elements."[15]

Since 2007, Aurora has been using the trademarks YooHoo and YooHoo & Friends in connection with the advertising and sale of plush toys.[16] It asserts that it has registered the YooHoo brand name in at least one other country.[17] On December 28, 2008, Aurora filed an application with the United States Patent and Trademark Office to register the YooHoo trademark in the United States.[18]

On October 2, 2009, Aurora's senior vice president for sales received an email from Bev Silvey, an independent contractor for Aurora who is the sales representative for North Carolina and Myrtle Beach. Silvey forwarded an email from one of her commercial customers, which stated that the customer "didn't know if you guys had seen these from Ty? Total rip off!"[19] Smiley observed that Ty's products were "ex-

registration number VA1–664–195 for the squirrel plush toy with sound. (*Id.*) Also on March 4, 2008, Aurora obtained copyright registration VA1–664–217 fora plush toy display box identified as "YooHoo Too." (*Id.*) Attached to the complaint are incomplete copyright applications for the YooHoo & Friends panda and penguin. (Complaint, Exh. A.) Attached to the complaint are other incomplete copyright applications that contain descriptions of plush toys that are not specific as to the animal the toy is intended to portray; the photocopied pictures attached are illegible. (*Id.*)

10. Complaint, ¶¶ 20–21.

11. Declaration of Robert T. Wuescher Pursuant to 28 U.S.C. § 1746 in Opposition to Aurora World, Inc.'s Motion for Preliminary Injunction ("Wuescher Decl."), Docket No. 21 (Dec. 2, 2009), ¶¶ 2, 5, 8, 11, 15, 18, 20. See also Declaration of Richard L. Jeffrey Pursuant to 28 U.S.C. § 1746 in Opposition to Aurora World, Inc.'s Motion for Preliminary

Injunction ("Jeffrey Decl."), Docket No. 19 (Dec. 2, 2009), ¶ 4.

12. Complaint, ¶ 23.

13. Jeffrey Decl., ¶ 3.

14. Motion at 1–2.

15. Motion at 5; Fitzhugh Decl., ¶ 8.

16. Motion at 5; Fitzhugh Decl., ¶ 14.

17. Fitzhugh Decl., ¶ 15. Attached to the Fitzhugh declaration is what purports to be the registration of the YooHoo mark in another country. The attached exhibit is in an unidentified foreign language. As no translation is provided, the document cannot be considered competent evidence. (*Id.*, Exh. G.)

18. *Id.*, ¶ 16, Exh. H.

19. Kessler Decl., Exh. E.

act copies of our Yoo–Hoo's, it is unbelievable."[20] The email does not attach any photographs or images; consequently, the court cannot determine whether either email refers to Beanie Boos or to any particular Beanie Boo toy.[21] On October 10, 2009, Aurora received an email from two Ty product collectors, apparently in the United Kingdom, who run a website for Ty collectors. Their email stated that they were "immediately struck by the similarity between" the YooHoos and the Beanie Boos,[22] and that the similarity between Ty's and Aurora's lemurs "goes beyond mere coincidence."[23] On November 13, 2009, Aurora's director of sales received an email from the manager of retail operations for the Calgary Zoo in Canada asking if Aurora made Beanie Boos because "[t]hey look very much like" the YooHoos.[24]

On October 12, 2009, Aurora advised Ty in writing of Aurora's copyrights and trademarks and accused Ty of infringing its intellectual property rights in the United Kingdom.[25] On October 16, 2009, Ty's counsel denied that any infringement had occurred.[26]

Aurora alleges that Ty's purported imitation of Yoo–Hoo & Friends products is causing actual confusion in the marketplace and diminishing the value of the YooHoo & Friends products by diluting their unique, distinctive nature and leading consumers erroneously to associate Yoo-Hoo & Friends with Ty rather than Aurora. Aurora asserts that Ty is trading on the goodwill Aurora has built through its development of innovative and unique designs. It contends that in addition to being the most important sales period for plush toy makers, the holiday season is when retailers test how well products fare in the marketplace; as a result, it asserts, orders for 2010 and beyond will be affected by decreased holiday sales.[27]

On November 17, 2009, Aurora commenced suit, alleging claims for copyright infringement, trade dress infringement, unfair competition, and false designation of origin under the Lanham Act, unfair competition under California Business & Professions Code §§ 17200 et seq., common law misappropriation, and common law unfair competition. Aurora seeks of preliminary and permanent injunctions, an award of Ty's profits, actual damages, attorneys' fees and costs, punitive damages, and interest.

## II. DISCUSSION

### A. Standard Governing Preliminary Injunctive Relief

 A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren,* 553 U.S. 674, 128 S.Ct. 2207, 2219, 171 L.Ed.2d 1 (2008). Thus, a district court should enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Win-*

**20.** *Id.*

**21.** The declaration attaching the email does not aver that the email refers to the Beanie Boos. (*Id.,* ¶ 14.)

**22.** *Id.,* ¶ 16, Exh. G.

**23.** *Id.* The Exhibit also attaches images that the declarant purports come from the website of the collectors. The website indicates that the pictures are of the United Kingdom release and that the plush toys were not available in the United States at the time of publi-

cation. The images include close-up pictures of the hang-tags that state the manufacturer as "Ty UK" or "TY U.K. LTD." (*Id.*)

**24.** *Id.,* ¶ 15, Exh. F.

**25.** Declaration of Wendy M. Mantell in Support of Aurora World, Inc.'s Motion for Preliminary Injunction ("Mantell Decl."), Docket No. 8 (Nov. 19, 2009), Exh. A.

**26.** *Id.,* Exh. B.

**27.** Motion at 8.

ter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 375, 172 L.Ed.2d 249 (2008). Such a showing requires that plaintiff establish it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Winter, 129 S.Ct. at 374. See Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1021 (9th Cir.2009) ("Under Winter, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest"). See also Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138 (9th Cir.2009) ("To qualify for injunctive relief, the plaintiffs must establish that 'the balance of equities tips in [their] favor,'" quoting Winter, 129 S.Ct. at 374); American Trucking Associations, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir.2009) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits," citing Winter, 129 S.Ct. at 374); Timbisha Shoshone Tribe v. Kennedy, 687 F.Supp.2d 1171, 1182 (E.D.Cal.2009) ("Pursuant to Winter, [p]laintiffs must make a 'clear showing' that they are 'likely to succeed on the merits,'" quoting Winter, 129 S.Ct. at 375–76).[28]

"[P]reliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable injury is likely in the absence of an injunction.'" Johnson v. Couturier, 572 F.3d 1067, 1081 (9th Cir.2009) (quoting Winter, 129 S.Ct. at 375).[29] If the harm to

---

**28.** At least one district court in the Ninth Circuit has considered this language, together with the Winter decision and found that "pre-Winter and pre-American Trucking, [a plaintiff] may have been able to produce only some evidence together with an arguable legal theory to satisfy the first part of the applicable test, and, moreover, all factual conflicts may have been resolved in his favor. However, post-Winter and post-American Trucking, [a plaintiff] carries a different burden. Now, he must establish that he is likely to succeed on the merits of his claims. Such is necessary in order to clearly show that he is entitled to preliminary injunctive relief." Small v. Swift Transportation Co., Inc., No. CV 09–4751 PSG (FMOx), 2009 WL 3052637, *5 (C.D.Cal. Sept. 18, 2009). See also Save Strawberry Canyon v. Department of Energy, No. C 08–03494 WHA, 2009 WL 1098888, *1 (N.D.Cal. Apr. 22, 2009) ("Winter can .. be construed to hold that the moving party must always show a probability of success on the merits (as well as a probability of injury)" (emphasis original)). Other district courts have found that "although Winter rejected injunctions based on a mere possibility of irreparable injury, it did not foreclose injunctive relief where irreparable injury is imminent and manifest but where the plaintiff can only raise 'serious questions' going to the merits but not a proba-

bility of success on the merits." Id. at *2. See also Habeas Corpus Resource Center v. U.S. Department of Justice, No. C 08–2649 CW, 2009 WL 185423, *5 (N.D.Cal. Jan. 20, 2009) ("When the balance of harm 'tips decidedly toward the plaintiff,' injunctive relief may be granted if the plaintiff raises questions 'serious enough to require litigation,'" quoting Independent Living Center of Southern California, Inc. v. Shewry, 543 F.3d 1047, 1049 (9th Cir.2008)).

**29.** Prior to the Supreme Court's decision in Winter, the Ninth Circuit had held that to prevail on a motion for preliminary injunction, a plaintiff must demonstrate either:

"either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represent extremes of a single continuum, rather than two separate tests. Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be shown." Stormans, 586 F.3d at 1127 (quoting Clear Channel Outdoor Inc. v. City of L.A., 340 F.3d 810, 813 (9th Cir. 2003) (emphasis original)).

plaintiff is merely monetary, it "will not usually support injunctive relief." *American Trucking*, 559 F.3d at 1057. See also *California Pharmacists Association v. Maxwell–Jolly*, 563 F.3d 847, 851–52 (9th Cir.2009) ("Typically, monetary harm does not constitute irreparable harm.... Economic damages are not traditionally considered irreparable because the injury *can later be remedied by a damage award*" (emphasis original)). In addition, harm that is "merely speculative" will not support injunctive relief, "although a loss of goodwill and reputation can do so." *American Trucking*, 559 F.3d at 1057.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 129 S.Ct. at 376. "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).[30]

■ "The public interest analysis for the issuance of a preliminary injunction requires [the court] to consider 'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'" *Independent Living Center of Southern California, Inc. v. Maxwell–Jolly*, 572 F.3d 644, 659 (9th Cir. 2009) (quoting *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1458 (Fed. Cir.1988)). "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Stormans*, 586 F.3d at 1138–39 (quoting *Bernhardt v. L.A. County*, 339 F.3d 920, 931 (9th Cir.2003)). "If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Id.* (citing *Sammartano v. First Judicial District Court*, 303 F.3d 959, 965 (9th Cir.2002)). See also *Sierra Forest Legacy*, 577 F.3d at 1022 ("When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction"). "[When] an injunction is asked which will adversely affect a public interest ... the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger*, 456 U.S. at 312–13, 102 S.Ct. 1798.

---

The *Winter* Court "definitively refuted" the Ninth Circuit's "possibility of irreparable injury" standard. *Id.* It held that "the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 129 S.Ct. at 375 (emphasis original). Following *Winter*, the Ninth Circuit has held that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *American Trucking*, 559 F.3d at 1052 (footnote omitted).

**30.** The *Winter* Court cautioned that " 'consideration of the public interest' is mandatory 'in assessing the propriety of any injunctive relief.' " *Nelson v. National Aeronautics and Space Administration*, 568 F.3d 1028, 1050 (9th Cir.2009) (Kleinfeld, J., dissenting from denial of rehearing en banc) (quoting *Winter*, 129 S.Ct. at 381 (emphasis original)).

"The plaintiffs bear the initial burden of showing that [issuance of an] injunction is in the public interest." *Stormans*, 586 F.3d at 1139 (citing *Winter*, 129 S.Ct. at 378). The district court, however, "need not consider public consequences that are 'highly speculative.'" *Id.* (quoting *Golden Gate Restaurant Association v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir.2008)). "In other words, the court should weigh the public interest in light of the likely consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence." *Id.* "The likelihood of confusion to consumers is [a] critical factor in our consideration" of harm to the public, as "[t]he public has an interest in avoiding confusion between two companies' products." *Internet Specialties West, Inc. v. Milon–DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 995 n. 5 (9th Cir.2009).[31]

### B. Aurora's Likelihood of Success on the Merits of Its Copyright Infringement Claim

■ Aurora seeks a preliminary injunction under the Copyright Act prohibiting Ty from infringing its copyrights in various YooHoo & Friends characters by marketing and selling Beanie Boos. To prevail on a copyright infringement claim, a plaintiff must show (1) ownership of a valid copyright and (2) copying of the original elements of the protected work. See *Feist Publications v. Rural Telephone Service Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) ("To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original"). "The word 'copying' is shorthand for the infringing of any of the copyright owner's ... exclusive rights, described [in section 106 of the Copyright Act]." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n. 3 (9th Cir. 1989).

### 1. Aurora's Ownership of a Valid Copyright

### a. The Bush Babies, Fennec, Lemur, Capuchin, and Squirrel Plush Toys

The first element Aurora must prove to prevail on its copyright infringement claim is ownership of a valid copyright in the YooHoo & Friends plush toys. See *Feist*, 499 U.S. at 361, 111 S.Ct. 1282. Aurora has proffered Certificates of Copyright Registration for the YooHoo bush baby plush toy in several formats (Nos. VA1–406–420, VA1–628–222, VA1–631–368, VA1–640–398, and VA1–640–401).[32] Additionally, it has proffered Certificates of Copyright Registration for the lemur plush toy with sound (VA1–640–404), the fennec plush toy with sound (VA1–664–220), the capuchin plush toy with sound (VA1–664–

---

**31.** After *Winter*, a district court cannot take an "an all-or-nothing approach to assessing the harms." *Sierra Forest Legacy*, 577 F.3d at 1022. Instead, the court must "address[ ] the options actually on the table." *Id.* In *Winter*, this meant addressing whether, given the fact that four restrictions on defendant's conduct were already in place, irreparable injury was likely to occur absent an injunction that included two additional restrictions, *Winter*, 129 S.Ct. at 376. In *Sierra Forest Legacy*, the Ninth Circuit reversed a district court's analysis and application of the non-merits injunctive relief factors that "boiled

down to a choice between" allowing the Forest Service to move ahead with a framework developed in 2004 or requiring the Forest Service to take no action at all with respect to fire prevention. The Ninth Circuit held that the district court erred by failing to consider whether a narrower injunction, such as one allowing the Forest Service to proceed under an unchallenged framework developed in 2001, would have served to prevent otherwise likely irreparable injury. *Sierra Forest Legacy*, 577 F.3d at 1022–23.

**32.** Fitzhugh Decl., Exh. F.

194), and the squirrel plush toy with sound (VA1–664–195). Finally, Aurora has proffered a Certificate of Copyright Registration for the YooHoo Too display box (VA1–664–217).[33]

A copyright registration certificate is *prima facie* evidence of copyright ownership. See 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate"); *Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.*, 307 F.3d 775, 781 (9th Cir.2002) (stating that a copyright "registration is considered *prima facie* evidence of the validity of the copyright"). "A certificate of copyright registration, therefore, shifts to the defendant the burden to prove the invalidity of the plaintiff's copyrights." *Ets–Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1076 (9th Cir.2000). Ty does not challenge the validity of Aurora's registered copyrights. Because there is no contrary evidence in the record, the court finds that Aurora has shown it will likely prove it is the owner of a valid copyright in the bush baby plush toy in several formats, the lemur plush toy with sound, the fennec plush toy with sound, the capuchin plush toy with sound, the squirrel plush toy with sound and the YooHoo Too display box.

### b. The Koala Plush Toy

■ Aurora has not proffered a filed application for copyright registration or registration certificate for its koala toy. Consequently, the court lacks jurisdiction to consider a copyright claim concerning the toy. See 17 U.S.C. § 411(a) ("[N]o action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title").[34]

### c. The Penguin, Panda, and Sugar Glider Plush Toys

Aurora does not contend that it has obtained a copyright on its penguin, panda, and sugar glider toys; rather, it asserts that it has applied for copyright registration respecting the toys. The Ninth Circuit has not yet addressed the proper interpretation of § 411(a), and there is a split of authority as to whether a copyright must actually have been registered before jurisdiction attaches under § 411(a). Compare *La Resolana Architects, PA v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1204 (10th Cir.2005) ("[W]e reject the proposition that § 411 confers federal court jurisdiction for an infringement action upon mere submission of a copyright application to the Copyright Office. In our view, the statute requires more: actual registration by the Register of Copyrights. Until that happens, an infringement action will not lie in the federal courts"); *Strategy Source, Inc. v. Lee*, 233 F.Supp.2d 1, 3 (D.D.C.2002) ("[T]his Court concludes that the position adopted by the Eleventh Circuit and several district courts is the approach mandated by section 411(a). The Court is in agreement with those courts that have found that permitting an infringement lawsuit to go forward in the absence of a registration certificate or denial of the same is in tension with the language of section 411(a) of the Copyright Act"); *Brush Creek Media, Inc. v. Boujaklian*, No. C–02–3491 EDL, 2002 WL 1906620, *3–4 (N.D.Cal. Aug. 19,

33. *Id.*

34. In addition, as respects in the Beanie Boos frog, husky, and monkey, Aurora has adduced no evidence that it filed an application for copyright registration or obtained a copyright on an analogous toy. Thus, to the extent such toys exist, the court is without jurisdiction to hear a copyright infringement claim respecting them.

2002) ("[T]he plain language of the [Copyright] statute precludes institution of an infringement action while a copyright application is merely pending, even though the Court ... [believes] that this result is inefficient"); *Harvard Apparatus, Inc. v. Cowen*, 130 F.Supp.2d 161, 164 (D.Mass. 2001) ("With respect to ... copyright infringement ... registration is a prerequisite to suit ..."); *Kregos v. Associated Press*, 795 F.Supp. 1325, 1331 (S.D.N.Y. 1992) ("Before commencement of an action for copyright infringement, a person must register a copyright claim with the Copyright Office.... Indeed, '[r]eceipt of an actual Certificate of Registration or denial of [the] same is a jurisdictional requirement'" (citations omitted)) with *Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357, 365 (5th Cir.2004) ("Although some circuits require that a plaintiff actually obtain a certificate from the Copyright Office before bringing suit, the Fifth Circuit requires only that the Copyright Office actually receive the application, deposit, and fee before a plaintiff files an infringement action," citing *Lakedreams v. Taylor*, 932 F.2d 1103, 1108 (5th Cir.1991)); *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir.1984) ("In order to bring suit for copyright infringement, it is not necessary to prove possession of a registration certificate. One need only prove payment of the required fee, deposit of the work in question, and receipt by the Copyright Office of a registration application"); *International Kitchen Exhaust Cleaning Association v. Power Washers of North America*, 81 F.Supp.2d 70, 72 (D.D.C.2000) ("To best effectuate the interests of justice and promote judicial economy, the court endorses the position that a plaintiff may sue once the Copyright Office receives the plaintiff's application, work, and filing fee"); *Dielsi v. Falk*, 916 F.Supp. 985, 994 n. 6 (C.D.Cal. 1996) ("Plaintiff can satisfy the § 411(a) requirement by merely filing an application for registration with the Copyright Office. Once the Copyright Office receives Plaintiff's application, he can bring a claim for copyright infringement. The receipt of Plaintiff's application satisfies § 411(a)'s jurisdictional requirement, whether or not the application is granted or denied, and whether or not the application precedes or follows the alleged infringement" (emphasis original; citations omitted)); *Havens v. Time Warner, Inc.*, 896 F.Supp. 141, 142–43 (S.D.N.Y.1995) ("In order to bring suit for copyright infringement, it is not necessary to prove possession of a registration certificate," citing *Apple Barrel*, 730 F.2d at 386); see generally *Loree Rodkin Management Corp. v. Ross–Simons, Inc.*, 315 F.Supp.2d 1053, 1054 (C.D.Cal.2004) (noting the "rather clear split in authority on the matter, including a decisive split between various California district courts" and the lack of Ninth Circuit authority).

Although some courts in this district have followed cases holding that a registration certificate is a prerequisite to suit, see, e.g., *Loree Rodkin*, 315 F.Supp.2d at 1055, Ty cites this court's recent decision in *Breakdown Services, Ltd. v. My Entertainment World, Inc.*, No. CV 08–5702 MMM (CWx), 2009 WL 3045807 (C.D.Cal. Sept. 18, 2009), wherein the court held that "a plaintiff can satisfy the registration requirement by showing that the Copyright Office received its application, fee, and deposit of the work in question prior to the date suit was filed." *Id.* at *1. See also *Gable–Leigh, Inc. v. North American Miss*, No. CV 01–01019 MMM, 2001 WL 521695, *4 (C.D.Cal. Apr. 13, 2001).

Ty notes that the copyright applications Aurora has submitted for the panda, penguin, and sugar glider plush toys omit the second page, are not dated or signed, omit critical information such as the "author" of the work, and do not include a stamp indicating that the applications and accom-

panying fee and depository materials were received by the Copyright Office before Aurora filed its complaint. "No court has held that a plaintiff can satisfy § 411(a) simply by placing the registration application, fee and deposit in the mail prior to filing suit, and the statute requires receipt of all three items, not simply the application itself, by the Copyright Office before suit is initiated." *Breakdown*, 2009 WL 3045807 at *2. Aurora's exhibits do not demonstrate that the registration applica-

tion, fee, and deposit were completed and mailed to the Copyright Office, much less that they were received.[35] Consequently, the court concludes that it lacks jurisdiction to hear copyright claims based on the panda, penguin, and sugar glider plush toys.

## 2. Extraterritorial Application of the Copyright Act

■ Although the court has found that it has jurisdiction to consider copyright infringement claims regarding Aurora's

---

**35.** In its reply, Aurora asserts that it "does not currently have versions of the applications stamped received by the copyright office in its possession, but given that the applications were sent almost a year prior to this lawsuit being initiated, it is reasonable to assume they have been received and are being processed." (Reply at 2–3 n. 2.) Aurora proffers no declaration or other evidence that the applications were in fact mailed more than a year ago; nor, for the reasons stated, can the court accept Aurora's invitation to assume that they have been received and are being processed. While Aurora submitted full copyright applications for the panda, penguin, and sugar glider plush toys in support of its reply (see Supplemental Declaration of Monica Fitzhugh in Support of Aurora World, Inc.'s Motion for Preliminary Injunction ("Fitzhugh Supp. Decl."), Docket No. 25 (Dec. 7, 2009), Exh. L), which include the second page of the application, the first page of the applications is not complete in that it does not list an author. The second page of the sugar glider application, moreover, does not include a signature. (*Id.*) If the applications were sent to the Copyright Office in this form, as Aurora's director of product development asserts under penalty of perjury, the court cannot assume that they were accepted as properly filed and are being processed. Additionally, Fitzhugh does not state that a filing fee and deposit material accompanied the applications. (*Id.*, ¶ 5.) See 17 U.S.C. § 409 ("The application for copyright registration shall be made on a form prescribed by the Register of Copyrights and shall include ... in the case of a work other than an anonymous or pseudonymous work, the name and nationality or domicile of the author or authors"); 17 U.S.C. § 408 ("[T]he owner of copyright or of any exclusive right in the work may obtain registration of the copyright claim by delivering to the Copyright Office the deposit specified by this section, together with the application and fee specified by sections 409"); *Geoscan, Inc. of Texas v. Geotrace Technologies, Inc.*, 226 F.3d 387, 393 (5th Cir.2000) (summary judgment was properly entered against a copyright claimant where the claimant had "submit[ted] an incomplete or inadequate application, fee, or deposit" to the Copyright Office); *Torres–Negron v. J & N Records, LLC*, 504 F.3d 151, 160 (1st Cir. 2007) ("The predominant rule is that an invalid registration (involving material errors, fraud, or an incomplete application) nullifies the federal court's subject matter jurisdiction").

At the hearing, Aurora stated that on the Friday before the Monday hearing on this motion it sought and received information verifying that the copyright applications had been received in the Copyright Office and were being processed. Aurora made no attempt to show good cause for the late retrieval of this evidence and Ty objected to its introduction. The court declines to consider evidence first proffered at the hearing. See *United States v. Halling*, 232 Fed.Appx. 692, 693 (9th Cir.2007) (Unpub.Disp.) ("We do not consider the additional arguments raised for the first time at oral argument," citing *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir.1992)); *White v. FedEx Corp.*, C04–00099 SI, 2006 WL 618591, *2 (N.D.Cal. Mar. 13, 2006) ("The Court will not consider any arguments or evidence raised for the first time at the hearing"). This is particularly true where, as here, the opposing party would be prejudiced by being denied the right to investigate or respond to the authenticity of the evidence.

bush babies, fennec, lemur, capuchin, and squirrel plush toys, plaintiff's complaint contains no allegations respecting the fennec, capuchin, and squirrel plush toys and does not plead that Ty is infringing its copyrights in these designs by selling a substantially similar animal-based toy. Indeed, the primary focus of Aurora's argument appears to be that Ty's Cleo and Bubblegum Beanie Boos are similar to the YooHoo & Friends lemur and bush baby plush toys.[36]

As noted, Ty asserts that it sells the Cleo and Bubblegum plush toys only in Europe and Canada; that they are not currently included on any order form Ty uses in the United States; that they are not currently depicted on Ty's website; and that Ty has no intention of offering Cleo and Bubblegum for sale in the United States pending final resolution of this lawsuit.[37] The question, therefore, is whether, as a matter of law, Ty infringes plaintiff's U.S. copyrights by selling a similar plush toy product outside the United States.

"It is a long-standing principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian American Oil Co. (Aramco)*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (quoting *Foley Brothers, Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). Because courts must "assume that Congress legislates against the backdrop of the presumption against extraterritoriality," unless "there is 'the affirmative intention of the Congress clear-

ly expressed,'" congressional enactments must be presumed to be "'primarily concerned with domestic conditions.'" *Id.* at 248, 111 S.Ct. 1227 (quoting *Foley Brothers*, 336 U.S. at 285, 69 S.Ct. 575, and *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957)).

"The 'undisputed axiom[ ]' ... that the United States' copyright laws have no application to extraterritorial infringement predates the 1909 Act." *Subafilms, Ltd. v. MGM–Pathe Communications Co.*, 24 F.3d 1088, 1095 (9th Cir.1994) (en banc) (quoting 3 Melville B. Nimmer and David Nimmer, NIMMER ON COPYRIGHT, § 12.04[A][3][b], at p. 12–86 (1991)). Sitting en banc, the Ninth Circuit found no "no clear expression of congressional intent in either the 1976 Act or other relevant enactments to alter the preexisting extraterritoriality doctrine." *Id.* at 1096. Noting "the continuing application of the principle that 'infringing actions that take place entirely outside the United States are not actionable in United States federal courts,'" it observed that "[h]ad Congress been inclined to overturn the preexisting doctrine that infringing acts that take place wholly outside the United States are not actionable under the Copyright Act, it knew how to do so," *id.* (quoting *Peter Starr Production Co. v. Twin Continental Films, Inc.*, 783 F.2d 1440, 1442 (9th Cir. 1986)). Animated by this consideration and concerned with international comity, the en banc court concluded that the Copyright Act does not extend "to acts of infringement that occur entirely overseas." *Id.* at 1097.[38]

---

**36.** Complaint, ¶ 23; Motion at 6, 13.

**37.** Jeffrey Decl., ¶ 3.

**38.** The Ninth Circuit created a narrow exception to *Subafilms'* broad ruling in *Los Angeles News Service v. Reuters Television International (USA) Ltd. (Reuters III)*, 149 F.3d 987 (9th Cir.1998). It held that where the initial act of

infringement, i.e., the manufacture of the copy, occurred in the United States, recovery based on subsequent reproduction and distribution abroad was permissible because "the infringing use would have been actionable *even if* the subsequent foreign distribution that stemmed from that use never took place." *Id.* at 991–92 (quoting *Subafilms*, 24

The Ninth Circuit has spoken clearly on the extraterritorial application of the Copyright Act. As Aurora has adduced no

evidence of domestic infringement of its copyrights by Ty with respect to the Cleo and Bubblegum plush toys,[39] and as Ty

F.3d at 1094 (emphasis original)). "Recovery of damages arising from overseas infringing uses was allowed because the predicate act of infringement occurring within the United States enabled further reproduction abroad." *Id.* at 992.

The Ninth Circuit subsequently limited the *Reuters III* holding in *Los Angeles News Service v. Reuters Television International (USA) Ltd. (Reuters V)*, 340 F.3d 926 (9th Cir.2003), clarifying that "no rational deterrent function is served by making an infringer whose domestic act of infringement—from which he earns no profit—leads to widespread extraterritorial infringement, liable for the copyright owner's entire loss of value or profit from that overseas infringement, particularly if the overseas infringement is legal where it takes place." *Id.* at 931.

Aurora cites a statement in Wuescher's declaration as evidence of a predicate act of domestic infringement. Wuescher states: "I was one of several designers primarily responsible for the development and design of Ty's BEANIE BOOS ™ line of plush toys." (Wuescher Decl., ¶ 3.) Aurora makes several assumptions based on this statement. First, it assumes that Wuescher referenced the Cleo and Bubblegum toys as well as other Beanie Boos. The context of the statement, however, undercuts this suggestion, as the preceding and succeeding paragraphs in the declaration discuss only Beanie Boos marketed in the United States. (*Id.*, ¶¶ 2, 4.) Second, Aurora assumes without foundation that Wuescher was in the United States when he participated in the design process. Third, based on Wuescher's assertion that he was "primarily responsible" for development and design of the Beanie Boos, it assumes that even if Wuescher supervised a process that occurred abroad from the United States, his supervision constitutes an actionable act of copyright infringement. This misapprehends Ninth Circuit law.

Aurora cites Professor Nimmer's treatise, which states that "if, and to the extent, a part of an 'act' of [copyright] infringement occurs within the United States, then, although such act is completed in a foreign jurisdiction, those parties who contributed to the act within the United States may be rendered liable under American copyright law." 4 NIMMER ON COPYRIGHT, § 17.02 at 17–19 (2008). Although

potentially authoritative in other jurisdictions, Nimmer does not appear to state the law of this circuit. Rather, *Reuters V*, which Aurora does not cite, limited the holding of *Reuters III*, and concluded that "an exception may apply where an act of infringement is completed *entirely* within the United States and that such infringing act enabled further exploitation abroad." *Reuters V*, 340 F.3d at 927 (emphasis supplied). To the extent Wuescher was directly involved in an allegedly infringing act, he makes clear that he was only "one of several designers primarily responsible for the development and design." (Wuescher Decl., ¶ 3.) If other participants in the design process were not in the United States, Wuescher's domestic acts of infringement do not justify extraterritorial application of the copyright laws under *Reuters V*, even if they would under Nimmer's formulation. This interpretation is consistent with the Ninth Circuit's desire to create a "narrow application" to avoid "over-deterrence [that] might chill the fair use of copyrighted works in close cases." *Reuters V*, 340 F.3d at 931.

In sum, the court cannot conclude that, standing alone, the single, general sentence in Wuescher's declaration on which Aurora relies demonstrates that it will likely succeed in proving the predicate facts necessary for extraterritorial application of the Copyright Act.

**39.** Aurora has adduced evidence that a marketing analyst in its employ purchased three sets of the "UK edition Beanie Boos," which included the Cleo and Bubblegum plush toys, over the Internet. (Declaration of Francesca Noh in Support of Aurora World, Inc.'s Motion for Preliminary Injunction ("Noh Decl."), Docket No. 28 (Dec. 7, 2009), ¶ 2, Exh. A.) Aurora, however, has not adduced evidence that *Ty* has sold the Cleo and Bubblegum plush toys in the United States. The marketing analyst purchased the toys from an online reseller named "Cindy Beans." (*Id.*) That the Cleo and Bubblegum plush toys were not sold by Ty in this country is confirmed by the fact that the online reseller labeled the package the "UK edition." Given that Ty was not directly involved in the sale, and that it most probably offered the toys sold by "Cindy Beans" outside the United States, Aurora

represents that it has not and will not market Cleo and Bubblegum in the United States during the pendency of this litigation, the court declines to consider these two toys in evaluating Aurora's likelihood of success on the merits of its copyright infringement claim.

### 3. Access and Substantial Similarity Between Aurora's Registered Yoo-Hoo & Friends Plush Toys and Ty's U.S.-Distributed Beanie Boos

■ To succeed on its copyright claim, Aurora must demonstrate that Ty "copied" its copyrighted designs. Because direct evidence of copying is generally not available, a plaintiff can establish copying by showing that defendant had access to the copyrighted work and that the parties' works are substantially similar. See *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir.1996) ("To establish a successful copyright infringement claim, a plaintiff must show that (1) she owns the copyright, and (2) defendant copied protected elements of the copyrighted work"); *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042,

1044 n. 2 (9th Cir.1994); *Berkla v. Corel Corp.*, 66 F.Supp.2d 1129, 1140 (E.D.Cal. 1999). Aurora's reply clarifies that its copyright claim is based on Ty's Cleo, Bubblegum, Bamboo, and Waddles plush toys.[40] As noted, the court declines to consider the Cleo and Bubblegum toys, as any finding of infringement based on these toys would amount to extraterritorial application of the Copyright Act. The court therefore examines whether Aurora will likely be able to show that Ty had access to Aurora's bush baby, lemur, fennec, capuchin, and squirrel plush toys and that Ty's panda and penguin plush toys are substantially similar to one or more of those toys.

■ Access is established if "plaintiff shows that the defendant had an opportunity to view or to copy the plaintiff's work." *Meta–Film Associates v. MCA*, 586 F.Supp. 1346, 1355 (C.D.Cal.1984) (citation omitted). "Circumstantial evidence of reasonable access is proven in one of two ways: (1) a particular chain of events is established between the plaintiff's work

does not rely on the evidence to prove that Ty infringed its copyrights in the United States. For that purpose, Aurora looks to the Wuescher declaration.

Aurora also relies on evidence that a sales sheet displaying the Cleo and Bubblegum toys was sent to a retailer in New Mexico. (Fitzhugh Supp. Decl., Exh. A.) Because it has not adduced evidence of an actual sale by Ty, however, this is insufficient to prove infringement. See, e.g., *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 718 (9th Cir. 2007) ("[T]he district court's conclusion [that distribution requires an 'actual dissemination'] is consistent with the language of the Copyright Act"); *In re Napster, Inc. Copyright Litigation*, 377 F.Supp.2d 796, 802–03 (N.D.Cal.2005) (citing a scholar's observation that "if the distribution right is to be infringed, 'an actual transfer must take place; a mere offer for sale will not violate the right,'" quoting 2 Paul Goldstein, COPYRIGHT § 5.5.1, at 5:102 to 5:102–1 (2d ed. 2000 & Supp. 2005), and citing *National Car Rental Sys.,*

*Inc. v. Computer Assoc. Int'l, Inc.*, 991 F.2d 426, 434 (8th Cir.), cert. denied, 510 U.S. 861, 114 S.Ct. 176, 126 L.Ed.2d 136 (1993); *Arista Records, Inc. v. Mp3Board, Inc.*, No. 00 Civ. 4660(SHS), 2002 WL 1997918, *4 (S.D.N.Y. Aug. 29, 2002); and *Obolensky v. G.P. Putnam's Sons*, 628 F.Supp. 1552, 1555–56 (S.D.N.Y.), aff'd, 795 F.2d 1005 (2d Cir. 1986)); *New Name, Inc. v. Walt Disney Co.*, No. CV 07–5034 PA (RZx), 2007 WL 5061697, *4 (C.D.Cal. Dec. 3, 2007) ("Offering for sale is not enough; a defendant must have actually completed a sale"); 2 David Nimmer & Melville B. Nimmer, NIMMER ON COPYRIGHT § 8.11[A], at 8–149 (2007) ("Infringement of [the distribution right] requires an actual dissemination of either copies or phonorecords").

To the extent Aurora infringement of its right to display under 17 U.S.C. § 106(3), this is addressed *infra*.

**40.** Reply at 2; Fitzhugh Decl., ¶ 11; Kessler Decl., ¶¶ 4–5.

and the defendant's access to that work (such as through dealings with a publisher or record company), or (2) the plaintiff's work has been widely disseminated." *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 482 (9th Cir.2000). Aurora relies on the second method; it proffers declarations stating that YooHoo plush toys have been widely available in the United States since 2006.[41] Indeed, Aurora has presented substantial evidence that YooHoo & Friends plush toys have been available globally. Ty does not dispute that it had access to them.

■■■■■ Having shown that it will likely be able to prove access, Aurora must next show that it will likely demonstrate that the penguin and panda Beanie Boos Ty distributes in the United States are substantially similar to Aurora's copyrighted YooHoo & Friends plush toys. To determine whether works are substantially similar, the Ninth Circuit uses both an extrinsic and an intrinsic test. The extrinsic test objectively considers whether there are substantial similarity in both ideas and expression, while the intrinsic test measures expression subjectively from the standpoint of the ordinary reasonable observer. See *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1442 (9th Cir. 1994) ("The intrinsic prong was a test for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance"); see also *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 637 (9th Cir.2008) (noting that the extrinsic test has evolved, and stating: "[T]he extrinsic prong was a test for similarity of ideas based on external criteria; analytic dissection and expert testimony could be used, if helpful. The intrinsic prong was a test for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance.... As it has evolved, however, the extrinsic test

now objectively considers whether there are substantial similarities in both ideas and expression, whereas the intrinsic test continues to measure expression subjectively," quoting *Apple Computer,* 35 F.3d at 1442); *Cavalier v. Random House, Inc.,* 297 F.3d 815, 822 (9th Cir.2002) ("The 'extrinsic test' is an objective comparison of specific expressive elements.... The 'intrinsic test' is a subjective comparison ...").

Analytical dissection of a work and expert testimony can be useful in conducting the extrinsic test. *Swirsky v. Carey,* 376 F.3d 841 (9th Cir.2004) ("The extrinsic test requires 'analytical dissection of a work and expert testimony,'" quoting *Three Boys Music Corp.,* 212 F.3d at 485); *Apple Computer,* 35 F.3d at 1442 ("As originally adopted in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1164 (9th Cir.1977), the extrinsic prong was a test for similarity of ideas based on external criteria; analytic dissection and expert testimony could be used, if helpful"); *Smith,* 84 F.3d at 1218. This is because "[e]xtrinsic analysis is objective in nature. '[I]t depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed.'" *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.,* 462 F.3d 1072, 1077 (9th Cir.2006) (quoting *Krofft,* 562 F.2d at 1164). " 'Analytical dissection' requires breaking the works 'down into their constituent elements, and comparing those elements for proof of copying as measured by "substantial similarity." ' " *Swirsky,* 376 F.3d at 845 (quoting *Rice v. Fox Broadcasting Co.,* 148 F.Supp.2d 1029, 1051 (C.D.Cal.2001)). "Because the requirement is one of substantial similarity to protected elements of the copyrighted work, it is essential to distinguish between

---

41. Motion at 11.

the protected and unprotected material in a plaintiff's work." *Id.*

"The 'intrinsic test' is a subjective comparison that focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.'" *Cavalier,* 297 F.3d at 822 (quoting *Kouf,* 16 F.3d at 1045). See also *Swirsky,* 376 F.3d at 847 (noting that the intrinsic test measures "whether subjectively the 'ordinary, reasonable person would find the total concept and feel of the [two works] to be substantially similar,'" quoting *Three Boys Music Corp.,* 212 F.3d at 485); *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir.1987) (applying the "total concept and feel" test to a comparison of stuffed dinosaur toys).

In *Apple Computer,* the Ninth Circuit set forth the steps a court must take to evaluate substantial similarity:

"(1) The plaintiff must identify the *source(s)* of the alleged similarity between his work and the defendant's work.

(2) Using analytic dissection, and, if necessary, expert testimony, the court must determine whether any of the allegedly similar features are protected by copyright .... [U]nprotectable ideas must be separated from potentially protectable expression; to that expression, the court must then apply the relevant limit-

ing doctrines in the context of the particular medium involved, through the eyes of the ordinary consumer of that product.

(3) Having dissected the alleged similarities and considered the range of possible expression, the court must define the scope of the plaintiff's copyright—that is, decide whether the work is entitled to 'broad' or 'thin' protection. Depending on the degree of protection, the court must set the appropriate standard for a subjective comparison of the works to determine whether, as a whole, they are sufficiently similar to support a finding of illicit copying." *Apple Computer,* 35 F.3d at 1443 (emphasis original).[42]

Because Aurora's copyright claim is limited to Ty's panda and penguin,[43]—and because the court's conclusion Aurora's copyright registrations and applications allows it to consider only Aurora's bush baby, squirrel, fennec, capuchin, and lemur toys in evaluating the claim—the first step in evaluating whether Aurora will succeed on the merits of its copyright claim is to examine whether Aurora has "identified the sources of alleged similarity [between the toys] by submitting a list of particular features in its works which are similar" to features in the allegedly infringing works. *Id.* at 1443. Aurora identifies the sources of similarities as the "distinctive and fanciful large eye styling, coloration, and stitch-

**42.** Rather than propose a method of analytic dissection, Aurora instead argues in its reply, without citation to authority, that analytic dissection is not warranted in this case because it has not licensed any portion of its copyright to Ty. (Reply at 3.) This limited interpretation of *Apple Computer* and its progeny is not warranted. See *Swirsky,* 376 F.3d at 845 (engaging in analytic dissection in a case unrelated to licensing); see also *Domingo Cambeiro Professional Corp. v. Advent,* 211 F.3d 1273 (Table), 2000 WL 262597, *4 (9th Cir. Mar. 7, 2000) (Unpub.Disp.) ("Although we have emphasized that analytic dissection is particularly helpful in the context of literary works, the extension of the extrinsic test to graphical user interfaces in *Apple Computer* refutes any claim that analytic dissection is inappropriate in the context of the graphic and visual arts").

**43.** In its reply, Aurora clarifies that its copyright claim concerns only Ty's Cleo, Bubblegum, panda and penguin toys. (Reply at 2.) Given the court's conclusion that the Copyright Act cannot be applied extraterritorially in this case, it need not consider Aurora's arguments regarding the Cleo and Bubblegum toys.

ing designs."[44] The next step under *Apple Computer*, therefore, is to examine "whether any of the allegedly similar features are protected by copyright." *Id.* There are several concepts that limit the amount of copyright protection to which a work is entitled. These include the merger doctrine;[45] the constraints of the medium that limit expressive options; and originality. *Id.* at 1444–45.

Before turning to the sources of similarity Aurora has identified, it is useful to note that no copyright protection can be afforded the idea of producing plush toys that resemble particular animals. See, e.g., *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir.2003) (holding that plaintiff could "not prevent others from copying aspects of his [jellyfish] sculptures resulting from ... jellyfish physiology"); *Aliotti*, 831 F.2d at 901 ("No copyright protection may be afforded to the idea of producing stuffed dinosaur toys or to elements of expression that necessarily follow from the idea of such dolls.... Appellants therefore may place no reliance upon any similarity in expression resulting from either the physiognomy of dinosaurs or from the nature of stuffed animals"). Thus, Aurora cannot claim infringement based on the fact that Ty manufactures and sells a plush toy that resembles an animal in the Yoo-Hoo & Friends line.

The first source of similarity that Aurora has identified is the coloration of its and Ty's toys. Aurora's bush baby plush toys are off-white, with gray faces, and have multi-colored (pink, orange, purple, or blue) striped tails. Aurora's squirrel toy is bright red and white. Aurora's fennec toy is light pink and white. Only Aurora's capuchin and lemur plush toys have natural coloration—the lemur is gray and white while the capuchin is dark and light brown.[46] Because the coloration of the bush baby, squirrel and fennec toys is fanciful, it is entitled to some protection. It is less clear that the coloration of the capuchin and lemur toys is a protectable element, given that it resembles the animals as they are found in nature.

The second source of similarity Aurora identified is the stitching design on its toys. It is difficult to conduct an extrinsic analysis of the element of the toys, as neither Aurora's motion nor the declarations it submitted defined the term. For the first time in its reply, Aurora argued that it intended to reference the stitching design of the mouth of its panda.[47] Because the stitching on the mouth appears to differ from anything found on a natural animal, it is potentially protectable. The court notes, however, that stitching is an essential element of any stuffed animal; the constraints of the medium therefore limit expressive options to some extent and the protection that can be afforded the stitching design of the panda's mouth is thin. *Apple Computer*, 35 F.3d at 1444 ("when similar features in a videogame are ' "as a practical matter indispensable, or at least standard, in the treatment of a given [idea]," ' they are treated like ideas and are therefore not protected by copyright").

Finally, Aurora identifies the large eyes on its toys as a source of similarity.[48] In

---

44. Motion at 13.

45. When an idea and its expression are indistinguishable or merged, the expression will be protected only against nearly identical copying. *Apple*, 35 F.3d at 1444.

46. Fitzhugh Decl., Exh. A.

47. Reply at 6.

48. In its reply, Aurora notes the rule that "the presence of ... many generic similarities and the common patterns in which they arise" can, under certain circumstances, satisfy the extrinsic test. (Reply at 3–4) (quoting *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002).) Stated differently, "[t]he particular sequence [or pattern] in which an author strings a significant number of unprotectable elements can itself be a protectable element."

*Alchemy II, Inc. v. Yes! Entertainment Corp.*, 844 F.Supp. 560 (C.D.Cal.1994), the court considered whether the shape of a teddy bear's head was protectable:

> "First, although the shape is somewhat distinctive, it is not unique. There are only a limited number of head shapes a teddy bear could have: round, oval, wider on the bottom than on the top (pear shaped), or wider on the top than on the bottom. Thus, this shape probably is not protectable." *Id.* at 568.

In like fashion, there are only a limited number of sizes for the eyes of a stuffed animal—they can be big, small, or medium-sized. It is questionable, therefore, that the large eyes of the YooHoo toys are protectable.

Additionally, as Ty correctly notes, "protection extends only to those components of a work that are original to the author." *Apple Computer*, 35 F.3d at 1445. Thus, to the extent aspects of Aurora's animals were not original, but found in prior stuffed animals, they cannot be considered protectable elements. Ty has proffered a number of plush toys that predate Aurora's YooHoo & Friends that also have large eyes. Russ Berrie's "Lil Peepers" line of big-eyed plush toys, which was marketed as early as 1994, appears to incorporate a style of large eyes that is similar to Aurora's YooHoo line.[49] A number of the plush toys in Petting Zoo's "Bright Eyes" line also have large eyes similar to the YooHoos. the "Bright Eyes" line was sold in 2006, when Aurora's YooHoo & Friends was still in development.[50] Given these similarities, it appears unlikely that Aurora will be able to establish that the large eyes of its YooHoo toys are protectable.

At best, therefore, Aurora's evidence suggests that it will be able to establish that it is entitled to only thin copyright protection for its YooHoo & Friends toys. As a result, "the appropriate standard [on which to evaluate whether there has been] illicit copying is virtual identity." *Apple Computer*, 35 F.3d at 1439, 1442. Employing this standard, Aurora has not shown that it will likely succeed on the merits of its copyright infringement claim. Viewed as a whole, neither Ty's panda nor its penguin is virtually identical to any of Aurora's bush baby, squirrel, fennec, capuchin, or lemur toys. See *id.* at 1446 ("This does not mean that at the end of the day, when the works are considered under the intrinsic test, they should not be compared as a whole"). This is particularly when one filters out the unprotectable elements of expression.

By way of example, Ty's panda is black and white, with green inside the ears and green eyes.[51] Ty's penguin is black and white, with blue eyes, and blue under the wings and on the feet.[52] These colors

---

*Metcalf*, 294 F.3d at 1074. Aurora's evidence, however, does not reveal many generic similarities aggregated in a common pattern. Perhaps because it tacitly acknowledges this, Aurora engages, immediately following its citation of *Metcalf*, in a two-page argument concerning the plush toys' eyes.

**49.** Wuescher Decl., ¶¶ 22–23, Exhs. K, N.

**50.** *Id.*, ¶¶ 22–23, Exh. M.

**51.** Even were the court to engage in a side-by-side comparison of Ty's and Aurora's pandas, it would not find their coloration substantially similar. Each company's panda is black and

white, consistent with the natural physiognomy of a panda. Ty's panda, however, has green coloring inside the ears and has a largely black lower body. Aurora's panda does not have green coloring and has a largely white lower body with gray paws. (Wuescher Decl., ¶ 12, Exh. F.)

**52.** Even were the court to engage in a side-by-side comparison of Ty's and Aurora's penguins, it would not find their coloration substantially similar. Aurora's penguin is dark blue, light blue and white, with green eyes. Ty's penguin is black and white, consistent with the natural physiognomy of a penguin, and has turquoise fins and eyes. (*Id.*, ¶ 16.)

nowhere appear on Aurora's bush baby, squirrel, fennec, capuchin, or lemur toys. Similarly, there are striking differences between the mouths and expressions of Aurora's panda and Ty's panda.[53] Ty's panda has a distinct and visible smiling mouth, making the panda appear happy. The mouth of Aurora's panda is largely obscured behind heavy fur; together with the shape of the eyes, this makes the panda appear sad. While there are some similarities between the eyes of Aurora's and Ty's toys, there are also significant differences in terms of the colors used on the outer edges of the eyes, the size of the eyes and the way the eyes are set on the head of the animal. To the extent there are similarities in the eyes, moreover, this element is not likely protectable, requiring that such similarities be filtered out. *Id.*

In sum, based on the record presently before the court, it appears that Aurora's YooHoo & Friends bush baby, squirrel, fennec, capuchin, or lemur toys are entitled, at best, to thin copyright protection. Ty's panda and penguin Beanie Boos are not virtually identical. Indeed, they are not even substantially similar. Aurora has not demonstrated, therefore, that it is likely to prevail on the merits of its copyright claim.

### 4. Infringement of Aurora's Right to Display

At oral argument, Aurora argued that Ty had infringed its right to display the bush baby and lemur plush toys[54] by including Cleo and Bubblegum on sales sheets, although not on the accompanying order forms, and by including cartoon caricatures resembling Cleo and Bubblegum on an unspecified number of display racks in retail stores.[55] Under 17 U.S.C. § 106, a copyright owner has an exclusive right, "in the case of literary, musical, dramatic, and choreographic works, pantomimes, and

---

53. Wuescher Decl., Exhs. E, F.

54. Aurora's proposed injunction would have restrained Ty from "selling, attempting to sell, offering to sell, causing to be sold, permitting any other individual or entity to sell, copying, reproducing, preparing derivative works of, publishing, *displaying* (either on a website or otherwise), disseminating, distributing, circulating, promoting, marketing, advertising, or in any way commercially exploiting the Beanie Boos products." ([Proposed] Preliminary Injunction, Docket No. 5 (Nov. 19, 2009) (emphasis supplied).) Its motion, however, did not discuss Ty's displays nor argue that there was infringement as a result. Similarly, Aurora's reply made only oblique references to Ty's displays. It noted the displays in the introductory section of the brief (see Motion at 1 ("Even as to those plush toys Ty claims are not being sold in the United States ..., Ty is at least ... prominently displaying them in its promotional materials ...")), and in connection with its arguments regarding extraterritorial application of the Copyright Act (see Motion at 8 ("Ty has displayed and offered for sale Cleo and Bubblegum in the U.S. In fact, the two lemurs appeared to be Ty's marquee Beanie Boos as evidenced by Ty's display racks, which prominently display[ ] Cleo and Bubblegum as the only Beanie Boos on its signage.... In addition, Cleo and Bubblegum were highlighted on Ty's October 2009 sale sheet, which was sent to its U.S. customers")). Aurora also discussed the display racks in arguing for extraterritorial application of the Lanham Act. (See Motion at 17 ("Indeed, the retail display signage for Beanie Boos includes a yellow tail.... Tellingly, *Ty itself does not even make a Beanie Boo with a yellow tail*" (emphasis original).)). Despite these references, Aurora has, at no time, attempted to make out a prima facie case of display infringement, cited to the sections of the Copyright Act governing display infringement, attempted to demonstrate that the actions of Ty fit any of the specified definitions for display infringement, or cited to any cases regarding display infringement. Indeed, at oral argument counsel did no more than note that the displays existed and cite the statute. The court's analysis of the purported display infringement claim is, consequently, hampered by the fact that none of the briefing addresses the issue.

55. Kessler Decl, Exh. C; Fitzhugh Decl., Exh. I.

pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly." 17 U.S.C. § 106(5).

"Display" means "to show a copy of [the copyrighted work], either directly or by means of a film, slide, television image, or any other device or process...." 17 U.S.C. § 101. Section 101 defines "copies" as "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." *Id.* "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Id.*

To "display a work 'publicly' means":

"(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101.

Aurora has adduced no evidence that the sale sheet sent to retailers was displayed at a place "open to the public" or at any place where a "substantial number of persons ... gathered." Consequently, it appears unlikely that Aurora would be able to prevail a claim that Ty infringed its right to display by including Cleo and Bubblegum on the document. Ty's display racks, by contrast, are meant to be used in retail stores open to the public.[56]

■ As respects the cartoon caricatures of Cleo and Bubblegum on the display rack, however, Aurora has not demonstrated, or even attempted to argue, that it will be able to prove virtual identity or substantial similarity between the copyrighted work and the caricatures on the display racks.[57] Aurora's description of the display rack, in fact, is internally contradictory. Aurora describes the display rack in only two places in its reply, stating first that the rack "prominently displays Cleo and Bubblegum" and then asserting that at least one of the cartoons on the rack represents a plush toy that "Ty itself does not even make."[58]

---

**56.** The definition of "publicly displayed" reflects Congress's intent to target the transmission of video:

"Under the bill, as under the present law, a performance made available by transmission to the public at large is 'public' even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission. The same principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms or the subscribers of a cable television service." H.R.Rep. No. 94–1476, at 64–65 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5678.

**57.** The court has already concluded that Aurora's evidence suggests it will be able to establish that it is entitled only to thin copyright protection. As noted, therefore, "the appropriate standard [on which to evaluate whether there has been] illicit copying is virtual identity." *Apple Computer,* 35 F.3d at 1439, 1442.

**58.** Reply at 8, 17.

As Aurora has not identified the sources of similarity between its YooHoo & Friends toys and the characters depicted on Ty's display rack, the court will utilize the three sources of similarity identified in connection with the toys themselves—coloration, stitching design, and eye styling.

Aurora has not shown that it will likely succeed on the merits of its copyright infringement claim with respect to the two cartoon caricatures depicted on the display rack. Viewed as a whole, neither is virtually identical, nor even substantially similar, to any of Aurora's bush baby, squirrel, fennec, capuchin, or lemur toys. See *id.* at 1446 ("This does not mean that at the end of the day, when the works are considered under the intrinsic test, they should not be compared as a whole"). This is particularly true when one filters out the unprotectable elements of expression. By way of example, the cartoon caricature on the right is magenta and white, with light pink hands, inner ears, and eyes.[59] The cartoon caricature on the left is off-white, with gray coloring around the eyes, gray hands, gray and blue ears, a gray and yellow tail, and blue eyes.[60] This configuration of colors nowhere appears on Aurora's bush baby, squirrel, fennec, capuchin, or lemur toys. Similarly, there are striking differences between the mouths and expressions of Aurora's toys and the cartoon Beanie Boos on the display rack, as the caricatures do not have mouths.[61] While there are some similarities between the eyes of the cartoon caricatures and Aurora's toys, there are also significant differences in terms of the colors used on the outer edges of the eyes and the size and orientation of the pupils; the pupils in the cartoon caricatures are much smaller in relation to the entire eye than is the case on Aurora's toys; they appear, moreover, to be directed downward. To the extent there are similarities in the eyes, moreover, this element is not likely protectable, requiring that such similarities be filtered out. *Id.*

In sum, the caricatures on Ty's display racks are neither virtually identical nor substantially similar to Aurora's plush toys. Aurora has not demonstrated, therefore, that it is likely to prevail on the merits of its claim that Ty infringed its right to display by sending display racks and/or the sales sheets to retailers.

## C. Aurora's Likelihood of Success on the Merits on the Lanham Act Claim

■■ Trademarks represent "a limited property right in a particular word,

---

59. It is not apparent which of its toys Aurora believes this caricature resembles. Among the toys Aurora lodged is a pink and white "ringtail cat." This toy appears most similar to the pink toy displayed on Ty's rack. Aurora, however, made no reference to the "ringtail cat" plush toy in its briefs, and adduced no evidence that Aurora holds a copyright in the design or filed a copyright application for this toy.

As respects the second caricature on the display rack, it appears most like Aurora's sugar glider. The coloration of the caricature and the sugar glider is not substantially similar, however, as the sugar glider has gray stripes across its face, gray ears and paws, green eyes, and a pink nose and mouth. The sugar glider also has webbing, similar to that found on a flying squirrel, running from its arms to its legs. The cartoon Beanie Boo has no gray coloring except two stripes on its tail. Rather, it is largely magenta and white, with pink hands and ears, has a black nose, pink eyes, and no mouth.

60. Even were the court to compare the cartoon Beanie Boo on the left of the display rack to Aurora's bush babies, it would not find substantial similarity in coloration. As Aurora notes in its reply, Ty does not make a Beanie Boo with a yellow striped tail. (Reply at 17.) Neither, indeed, does Aurora, although it manufactures a YooHoo with a rust-colored tail and eyes. Although Aurora manufactures a blue-eyed bush baby, it does not have blue ears or a yellow tail.

61. Kessler Decl., Exh. C.

phrase, or symbol." *New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 306 (9th Cir.1992). To prevail on its trademark infringement claim, plaintiff must prove "(1) that it has a protectible ownership interest in [a] mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the [plaintiff's] rights to the mark." *Department of Parks & Recreation v. Bazaar Del Mundo Inc.,* 448 F.3d 1118, 1124 (9th Cir.2006) (citing *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1354 (9th Cir.1985) (en banc)).

■■■ Trade dress, including the design of a product, can be protectable under the Lanham Act. *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 216, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) ("We hold that, in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning"). "Trade dress refers to the overall appearance of the product design, rather than its mechanics or a specific logo." *Global Manufacturing Group, LLC v. Gadget Universe.Com,* 417 F.Supp.2d 1161, 1164 (S.D.Cal.2006) (citing *Wal–Mart,* 529 U.S. at 209–10, 120 S.Ct. 1339). See also *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769–70, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (" 'The "trade dress" of a product is essentially its total image and overall appearance,' " quoting *Blue Bell Bio–Medical v. Cin–Bad, Inc.,* 864 F.2d 1253, 1256 (5th Cir.1989)). "It 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.' " *Id.* (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983)). See also *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252 1257 (9th Cir.2001) ("Trade dress re-

fers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations, texture or graphics,' " quoting *International Jensen,* 4 F.3d at 822). *Global Manufacturing,* 417 F.Supp.2d at 1166 ("Trade dress refers to the visual aspects of a product relating to its design or style," citing *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.,* 199 F.3d 1009, 1011 n. 3 (9th Cir. 1999)). "Trade dress protection is broader in scope than trademark protection, both because it protects aspects of packaging and product design that cannot be registered for trademark protection and because evaluation of trade dress infringement claims requires the court to focus on the plaintiff's entire selling image, rather than the narrower single facet of trademark." *Vision Sports,* 888 F.2d at 613.

■■■ "[T]rade dress may be protected if it is nonfunctional and has acquired secondary meaning and if its imitation creates a likelihood of consumer confusion." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 842 (9th Cir.1987). "To prove trade dress infringement, a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products." *Art Attacks Ink, LLC v. MGA Entertainment Inc.,* 581 F.3d 1138, 1145 (9th Cir.2009). Where, as here, the trade dress for which protection is sought is the design of the product itself, plaintiff "bears the burden of establishing first, that the features sought to be protected are *not* functional, but were selected arbitrarily or for purely aesthetic reasons; second, that the design has acquired a distinctive meaning such that consumers identify the trade dress with the *source* of the product rather than the product itself; and third, that the

infringing product is likely to cause confusion as to its origin." *Global Manufacturing,* 417 F.Supp.2d at 1167 (citing *Wal–Mart,* 529 U.S. at 210, 120 S.Ct. 1339) (emphasis original). When trade dress rights are asserted in a product design, "courts should err on the side of caution" because "product design almost invariably serves purposes other than source identification." *Wal–Mart,* 529 U.S. at 213, 120 S.Ct. 1339.

## 1. Extraterritorial Reach of the Lanham Act

■■■ In its reply, Aurora argues for the first time that a Lanham Act injunction should be entered that applies internationally.[62] Before it is appropriate to apply the Lanham Act extraterritorially, "first, there must be some effect on American foreign commerce; second, the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; and third, the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority." *Reebok International, Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 554 (9th Cir.1992) (quoting *Star–Kist Foods, Inc. v. P.J. Rhodes & Co.,* 769 F.2d 1393, 1395 (9th Cir.1985)).[63]

### a. Effect on American Foreign Commerce

To establish that it is appropriate to apply the Lanham Act extraterritorially, Aurora must first show that there is "some effect on American foreign commerce." *Reebok,* 970 F.2d at 554 ("The sales of infringing goods in a foreign country may have a sufficient effect on commerce to invoke Lanham Act jurisdiction," quoting *Ocean Garden, Inc. v. Marktrade Co., Inc.,* 953 F.2d 500, 503 (9th Cir.1991)). In addition, Aurora must demonstrate that the effect is "sufficiently great to present a cognizable injury." *Id.* The facts of *Reebok* are relevant in understanding the extent of the injury necessary to extend the reach of the statute extraterritorially. There, defendant organized and directed the manufacture of counterfeit shoes in Mexico, knowing that the shoes would enter U.S. commerce with regular frequency. The evidence showed that sales of the counterfeit shoes in the United States decreased sales of genuine Reebok shoes and decreased the value of Reebok's consolidated holdings. The court concluded that defendant's activities "thus affect[ed] American foreign commerce in a manner which cause[d] injury to [plaintiff] cognizable under the Lanham Act." *Reebok,* 970 F.2d at 554–55.[64]

---

**62.** Reply at 17–18. Because the reply does not specify the countries in which Aurora believes the the injunction should apply and because none of Aurora's filings provide an exhaustive list of the countries in which it believes Ty is infringing, the court presumes Aurora seeks a worldwide injunction.

**63.** This three-part test was originally articulated in *Timberlane Lumber Co. v. Bank of America National Trust & Savings Association (Timberlane I),* 549 F.2d 597 (9th Cir.1976), where it was applied to antitrust law under the Sherman Act. Subsequent to *Timberlane I,* Congress enacted section 6a of the Sherman Act, which governs the extraterritorial reach

of the antitrust laws and supersedes the Ninth Circuit's test. See *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 814 n. 8 (9th Cir.1988) (recognized that *Timberlane I* was overruled by 15 U.S.C. § 6a). Although *Timberlane I* was overruled as respects extraterritorial application of the antitrust law, the three-part test remains valid for purposes of assessing the extraterritorial application of the Lanham Act and trademark law.

**64.** In *Reebok,* plaintiff alleged that defendant sold the counterfeit shoes in Mexican border towns, such as Tijuana, knowing that the shoes would subsequently be imported into the United States. *Reebok,* 970 F.2d at 554.

Aurora proffers two pieces of evidence with its reply brief that purportedly support a finding that Ty's sales of Beanie Boos have had a significant effect on American commerce. First, a marketing analyst in its employ purchased three sets of the "UK edition Beanie Boos," over the Internet; these included the Cleo and Bubblegum plush toys.[65] Second, a card store in Santa Fe, New Mexico received a brochure that includes pictures of the Cleo and Bubblegum plush toys.[66] There is no indication that an order form that accompanied the brochure offered the toys for sale or that the card store purchased any Cleo or Bubblegum plush toys.

Aurora has adduced no evidence that it has lost sales in the United States, however. *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 899 (9th Cir.2002) (holding that sales of an album worldwide had a sufficient effect on American foreign commerce to apply the Lanham Act extraterritorially where plaintiff "suffered monetary injury in the United States from those sales");[67] *Ocean Garden*, 953 F.2d at 503 (accepting as evidence that the first and second factors for exercise of extraterritorial jurisdiction were satisfied by proof that plaintiff was losing millions of dollars in the United States, but rejecting as speculative a claim that infringement abroad caused dilution of plaintiff's trademark in the United States); *New Name, Inc. v. The Walt Disney Co.*, No. CV 07–5034 PA (RZx), 2008 WL 5587486, *7 (C.D.Cal. July 25, 2008) (concluding that it was appropriate to apply the Lanham Act extraterrito-

rially based on evidence that a loss of sales occurred following infringement).

■■■ The present record does not support a finding that Aurora is likely to prove Ty's sales of Beanie Boos in countries other than the United States has a significant effect on American foreign commerce. A single retailer's Internet sale of Cleo and Bubblegum plush toys does not show a significant effect on American foreign commerce, particularly when there is no evidence that the retailer is located in the United States, received the toys in the United States,[68] or obtained the toys directly from Ty. Additionally, there is no evidence of actual confusion, as the individual who bought the toys was associated with plaintiff. Cf. *Love v. The Mail on Sunday*, 473 F.Supp.2d 1052, 1055 (C.D.Cal.2007) (discounting evidence of a single purchase over the Internet website "eBay" of an infringing CD produced in the United Kingdom, where purchaser had an apparent affiliation with plaintiff's counsel). In any event, even were the court to find that this single sale showed that Ty's foreign sales had *some* effect on American foreign commerce, it would be unable to conclude, based on one sale, that "the effect was sufficiently large" to satisfy the second factor. *Gushi Brothers Co. v. Bank of Guam*, 28 F.3d 1535, 1544 n. 13 (9th Cir.1994). Moreover, given that Aurora's marketing analyst is an employee of the company and not a disinterested consumer, and that she was *not* confused by any alleged similarities in the products,

---

65. Noh Decl., ¶ 2, Exh. A.

66. Fitzhugh Supp. Decl., ¶ 4, Exh. K.

67. In *Mattel*, the Ninth Circuit affirmed a district court finding that production abroad of the *Barbie Girl* song, which allegedly infringed Mattel's Barbie trademark, had domestic implications in that "defendants participated in activities resulting in sales of Barbie Girl in the United States, as well as

abroad" and the activities caused "monetary injury in the United States." *Mattel, Inc. v. MCA Records, Inc.*, 28 F.Supp.2d 1120, 1129 (C.D.Cal.1998).

68. The fact that the toys were denominated the "UK edition" gives rise to an inference that the retailer who sold to Aurora's marketing analyst may have purchased the set in the United Kingdom, not directly from Ty in the United States.

her purchase of Ty's Cleo and Bubblegum plush toys does not demonstrate that any United States consumer has been confused by allegedly similarities between the brands.

### b. Interests of and Links to American Foreign Commerce in Relation to Those of Other Nations

■ The court's inquiry regarding the third factor requires consideration of seven factors: "[1] The degree of conflict with foreign law or policy, [2] the nationality or allegiance of the parties and the locations or principal places of businesses or corporations, [3] the extent to which enforcement by either state can be expected to achieve compliance, [4] the relative significance of effects on the United States as compared with those elsewhere, [5] the extent to which there is explicit purpose to harm or affect American commerce, [6] the foreseeability of such effect, and [7] the relative importance to the violations charged of conduct within the United States as compared with conduct abroad." *Star–Kist,* 769 F.2d at 1395 (quoting *Timberlane I,* 549 F.2d at 614). The only evidence or argument Aurora proffers regarding any of these factors are allegations in its complaint that it is a California corporation that has its principal place of business in the state, California and that Ty is a Delaware corporation whose principal place of business, on "information and belief," is in Illinois.[69]

■ To properly evaluate the third *Timberlane* factor, the court would have to examine whether the trademark laws of the United States, the United Kingdom, Canada, and any other country in which Aurora claims infringement are in conflict or are congruent. It would also have to evaluate the extent to which enforcement actions in the United Kingdom, Canada, or other countries could be expected to achieve compliance. *Love,* 473 F.Supp.2d at 1057 (finding that at least one aspect of U.K. trademark law "differ[ed] significantly" from U.S. trademark law and that "[g]iven the narrower scope of the English cause of action, the Court should not apply U.S. trademark law because the conduct might have been lawful in the country in which it occurred"). Aurora has presented no evidence or argument regarding any of these subjects.[70] Consequently, the court is unable to evaluate whether extraterritorial application of the Lanham Act in this case might create a conflict with the trademark law of another country. *Star–Kist,* 769 F.2d at 1396.

Another factor bearing on whether enforcement in another country would be more likely to achieve compliance than issuance of an injunction in this action is where "the majority of the allegedly infringing conduct occurred." *Love,* 473 F.Supp.2d at 1057 ("The third sub-factor also counsels against application of the Lanham Act; since the majority of the allegedly infringing conduct occurred in the United Kingdom, a court there is better-positioned than this Court to provide effective relief"). It appears that sales of the Cleo and Bubblegum plush toys have overwhelmingly been consummated abroad; Aurora cites only incidental or indirect contact between those plush toys and the United States. With respect to

---

69. Complaint, ¶¶ 2–3.

70. Included in this inquiry is whether any injunction issued by this court could be enforced abroad. *Mattel,* 28 F.Supp.2d at 1130. Again, Aurora has neither pointed the court to the law of foreign jurisdictions indicating that its order would be enforceable abroad, nor has it necessarily indicated an exhaustive list of countries in which such an international would be enforced.

other potentially infringing Beanie Boos, Aurora has presented no evidence detailing the country in which a majority of the infringing sales or offers for sale has been made.[71]

The court similarly cannot analyze the relative significance of effects on the United States and elsewhere because Aurora has adduced no evidence regarding the proportion of its sales that is domestic and the proportion that is foreign.[72] If the court knew where a majority of the sales occurred, it would also be in a better position to evaluate which court is "better-positioned ... to provide effective relief." *Love*, 473 F.Supp.2d at 1057. As for the next relevant consideration, there is no evidence that Ty had the "explicit purpose to harm [or affect] U.S. commerce."[73] *Id.* Aurora likewise has proffered no evidence that harm to American commerce was foreseeable. Since it appears that most of the allegedly infringing conduct occurred overseas, at least as respects the Cleo and Bubblegum plush toys, "the conduct that occurred abroad is far more important to the allegations of this case than any conduct that occurred in the United States." *Id.*

71. Aurora does not represent that it has not brought enforcement actions in other countries and that it will not begin one while these proceedings are pending. Cf. *Ocean Garden*, 953 F.2d at 503 ("In the case before us, there are no pending proceedings in Hong Kong or Taiwan"). The *Ocean Garden* court appeared to hold that in the absence of pending proceedings, this factor would not weigh against extraterritorial application. *Id.* ("Absent a determination by the [foreign] court that [defendant] has a legal right to use the marks, and that those marks do not infringe [plaintiff's] mark, we are unable to conclude that it would be an affront to [the foreign country's] sovereignty or law"). Although some district courts continue to apply this holding, see, e.g., *Mattel*, 28 F.Supp.2d at 1130 ("Since there are no proceedings currently in Sweden or Denmark, and because the conduct complained of impacts the U.S. market, there is no real sovereign conflict," citing *Ocean Garden*, 953 F.2d at 503), this interpretation was explicitly repudiated in *Reebok:*

"In *Ocean Garden*, we quoted with approval the district court's statement in *Reebok I* [*Reebok Intern. Ltd. v. Marnatech Enterprises, Inc.*, 737 F.Supp. 1515 (S.D.Cal.1989)] that "[s]ince to this Court's knowledge there has been no adjudication on the merits in the Mexican courts, there is no danger at this time of this preliminary injunction interfering with the laws of a foreign nation." *Ocean Garden*, 953 F.2d at 504. Demonstration of a *present* and *direct* conflict between the laws of two nations, however, is unnecessary: it is a sufficiently cognizable interest under the *Timberlane* test for there to exist the *possibility* of a conflict between the law or policy of the United States and the law or policy of another nation. Of course, the degree of the risk of conflict is highly relevant to the *weight* of that factor in the *Timberlane* balance: the greater the possibility of conflict, the less the exercise of extraterritorial jurisdiction is justified, and vice-a-versa." *Reebok*, 970 F.2d at 555 n. 2 (emphasis original).

Under *Reebok*, a pending proceeding abroad is not a *sine qua non* of the conflicting law analysis. Because Aurora has presented no evidence regarding the existence of a conflict of any kind, and has not addressed whether there are pending proceedings between the parties in another jurisdiction, the court cannot evaluate the weight of this factor.

72. Ty repeatedly cites this omission as a glaring deficiency in Aurora's motion. (Opp. at 2, 16, 18, 19 & nn. 11, 12, 13). Although presumably sales figures for YooHoo & Friends products are entirely within Aurora's control, and although Aurora adduced significant additional evidence in support of its reply, it presented no information regarding its U.S. sales.

73. In *Winterland Concessions Co. v. Fenton*, 835 F.Supp. 529 (N.D.Cal.1993), the court found intentional infringement where defendant, knowing of plaintiffs' exclusive rights in photographs of popular artists, used them without paying licensing fees. *Id.* at 531. While Aurora has established that Ty had access to YooHoo & Friends in the marketplace, there is no evidence that Ty actually knew YooHoo & Friends products existed.

At best, Aurora has offered weak evidence that Ty's allegedly infringing conduct has had an effect on American foreign commerce. It has not demonstrated that that effect is sufficiently great to present a cognizable injury. In addition, it has adduced no evidence or argued persuasively that the interests of and links to American foreign commerce are sufficiently strong in relation to those of other nations that the extraterritorial application of the Lanham Act is warranted.[74] Consequently, the court concludes that Aurora has not shown it is likely to succeed on the merits of its argument that the court should exercise extraterritorial jurisdiction under the Lanham Act.

### 2. Non–Functionality

■ The Lanham Act expressly provides that a plaintiff who asserts infringement of a nonregistered trade dress "has the burden of proving that the matter sought to be protected is not functional." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (quoting 15 U.S.C. § 1125(a)(3)). "The requirement of nonfunctionality is based 'on the judicial theory that there exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws.'" *Clamp Manufacturing Co. v. Enco Manufacturing Co., Inc.*, 870 F.2d 512, 515 (9th Cir.1989) (quoting *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1336 (C.C.P.A.1982)).

When a product is useful, trademark protection cannot be used to extend the life of the useful invention by protecting the design from competition. "If the utilitarian aspects of the product are its essence, only patent law protects its configuration from use by competitors." *Id.* See also *TrafFix Devices*, 532 U.S. at 34, 121 S.Ct. 1255 ("The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity").

■ "For an overall product configuration to be recognized as a trademark, the entire design must be nonfunctional." *Clamp*, 870 F.2d at 516. "Several factors guide the decision whether a product feature is functional, including: (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available thereby showing that the plaintiff's choices were arbitrary or aesthetic; (3) whether the advertising touts the utilitarian advantages of the product; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Global Manufacturing*, 417 F.Supp.2d at 1168 (citing *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 823 (9th Cir. 1993)). "No one factor is dispositive; all should be weighed collectively." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir.1998). The judicial "inquiry is not directed at whether the individual elements are functional but

---

**74.** There is an exception to the territoriality principle that recognizes that those who use marks in other countries can, when their marks are famous enough, claim exclusive rights to the marks in this country. To invoke this exception, a trademark holder must show first that its mark has acquired secondary meaning in the market where the dispute has arisen, and second that "a *substantial* percentage of consumers in [that] ... market is familiar with the foreign mark." *Grupo Gi-*

*gante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1098 (9th Cir.2004) (emphasis original). The fact that the manager of the Calgary Zoo and the United Kingdom plush toy collectors are familiar with Ty's and Aurora's trade dress does not demonstrate that Aurora's trade dress has acquired secondary meaning in the United States market, nor that a substantial percentage of American consumers are is familiar with the trade dress.

whether the whole collection of elements taken together are functional." *International Jensen,* 4 F.3d at 823.

A single product feature, by contrast, will be deemed "functional if it is essential to the use or purpose of the article or affects the cost or quality of the article.... [A] functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *TrafFix Devices,* 532 U.S. at 32, 121 S.Ct. 1255 (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) and *Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (alteration original)). Courts also consider whether the feature at issue "constitute[s] the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 774 (9th Cir.1981). "[T]he existence of alternative designs that would not hinder competition" also bears on whether a feature is functional. *Catalyst,* 2001 WL 34118030 at *9 (citing *International Jensen,* 4 F.3d at 822–23). Although Aurora has claimed protection in the "overall look and feel" of the YooHoo & Friends plush toys, it has also emphasized that it is "unique eye styling" that gives "Aurora World's products their unusual look." [75] Consequently, it is not clear whether Aurora asserts a trade dress claim with respect to the overall configuration of the YooHoo toys, the single product feature of the patented eyes, or both.

Aurora contends that the trade dress of YooHoo & Friends is the "design of the product, including the large round eyes, coloration, poses of the animals, size and shape of the animals, and stitching designs." [76] It asserts in conclusory fashion that each of these features has no particular utilitarian advantage. In *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503 (9th Cir.1987), plaintiff similarly argued that the features of synthetic animal heads used as displays in commercial establishments, such as eyes, nostrils, ears, and noses, were not real, did not "work," and therefore were not functional. *Id.* at 1506. The Ninth Circuit rejected this argument, stating: "Functional features of a product are features 'which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product.'" *Id.* (quoting *Vuitton,* 644 F.2d at 774 (in turn quoting *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 917 (9th Cir.1980), cert. denied, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981))). The court noted that plaintiff "sought to create realistic reproductions of animals," and that "[t]he features that he point[ed] to [were] all absolutely essential to that goal." Consequently, it concluded, "[n]one of the[ ] features [was] nonfunctional." *Id.* at 1507.

Although Aurora's goal in designing YooHoo & Friends does not appear to have been the "realistic" depiction of animals, a factfinder will likely conclude that the eyes of the toys are functional because they are essential to the goal of making the plush toys look like animals; this is because plush toys without eyes would not resemble their counterparts in nature. To the extent that other attributes, such as the shape and coloration of the toys, are designed to make them resemble an animal, it is similarly unlikely that Aurora will be able to prove nonfunctionality.

---

**75.** Reply at 2, 11.

**76.** Motion at 16.

In an effort to distinguish *Rachel,* Aurora quotes selective portions of *Fabrica Inc. v. El Dorado Corp.,* 697 F.2d 890, 894–95 (9th Cir.1983).[77] A fuller examination of the passage on which it focuses illustrates why the case, if anything, supports Ty:

" 'Functional' ... might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made." *Id.* at 894–95 (quoting *Pagliero v. Wallace China Co.,* 198 F.2d 339, 343 (9th Cir.1952)).

As the *Fabrica* court noted, the *Pagliero* functionality test has been limited "to product features"; the Ninth Circuit "has refused to apply the test to cases involving trade dress and packaging." *Id.* at 895. Because Aurora has asserted a trade dress claim, the test is inapposite. To the extent that Aurora's citation of *Fabrica* suggests it is attempting to assert a trade dress claim based on product features, it fails to demonstrate that the design aspects of YooHoo & Friends on which it bases the trade dress claim—in particular the large eyes—are not "important ingredient[s] in the commercial success of the product." *Id.* Aurora states that the "large round eyes, coloration, poses of the animals, size and shape of the animals, and stitching design all contribute to the products' consumer appeal." [78] It also contends that these features "enabled [it] to achieve success in the plush toy market." [79]

In *Au–Tomotive Gold, Inc. v. Volkswagen of America, Inc.,* 457 F.3d 1062 (9th Cir.2006), the Ninth Circuit synthesized "forty years of ... scattered references to [the] aesthetic functionality [doctrine articulated in *Pagliero* ]." *Id.* at 1072. Given the Supreme Court's decisions in *Qualitex* and *TrafFix,* the court noted that a two-step test must be used to determine functionality. "In the first step, courts inquire whether the alleged 'significant non-trademark function' satisfies the *Inwood Laboratories* definition of functionality—'essential to the use or purpose of the article [or] affects [its] cost or quality.' " *Id.* (quoting *TrafFix Devices,* 532 U.S. at 32–33, 121 S.Ct. 1255). If the feature is essential to the use or purpose of the article *or* affects its cost or quality, "the inquiry is over—the feature is functional and not protected." *Id.* If, by contrast, there is a claim of "aesthetic functionality," the court "inquires whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." *Id.*

This formulation limits "aesthetic functionality" to "product features that serve an aesthetic purpose wholly independent of any source-identifying function." *Id.* The court cited with approval four examples of aesthetic functionality. First, it noted that in *Qualitex,* the Supreme Court held that the use of a particular color on dry cleaning pads might avoid noticeable stains. *Qualitex,* 514 U.S. at 166, 115 S.Ct. 1300. Second, it noted *Publications International, Ltd. v. Landoll, Inc.,* 164 F.3d 337 (7th Cir.1998), in which the Seventh Circuit held that coloring the edges of cookbook

---

77. Reply at 10.

78. Motion at 16.

79. Motion at 5.

pages prevented the appearance of "bleeding" when the book was closed. *Id.* at 342. Third, in *Brunswick Corp. v. British Seagull, Ltd.,* 35 F.3d 1527 (Fed.Cir.1994), the Federal Circuit held that painting a product black served a functional purpose by decreasing the apparent size of the object. *Id.* at 1532. Finally, in *Pagliero,* the court held that the "china patterns at issue ... served [a] nontrademark purpose because 'one of the essential selling features of hotel china, if, indeed, not the primary [feature], is the design.'" *Au–Tomotive Gold,* 457 F.3d at 1073 (quoting *Pagliero,* 198 F.2d at 343).

Based on these examples, the Ninth Circuit in *Au–Tomotive Gold* held that the logos of Volkswagen and Audi were not functional because they, like other logos and company names, "generally have no function apart from their association with the trademark holder." *Id.* Unlike logos, the aesthetic features of plush toys such as those manufactured by Aurora and Ty are essential selling features of the toys. Comparing logos and company names, on the one hand, and plush toys and china patterns, on the other, aids in discerning what constitutes an "aesthetic purpose wholly independent of any source-identifying function." *Id.* at 1072. A manufacturer or designer has an incentive to make a china pattern or plush toy aesthetically pleasing because that drives the consumer's decision to buy the plate or toy. Such designs are, therefore, functional. By contrast, aesthetically pleasing as a logo may be, it merely identifies the source of the product.

As noted, some of the design features, to the extent they make the toys resemble animals are functional for that reason. Other design features, such as the fanciful coloring of the toys, are aesthetically func-tional as that term is used in *Au–Tomotive Gold.* The same is true of the YooHoo's overall design. It is the toys' aesthetics that drive the consumer to purchase them; this functionality exists independent of its source-identifying function.

As respects the eyes of the YooHoo & Friends toys, Ty notes that the inventor of Aurora's recessed eyes obtained a patent on the invention.[80] Whether a plaintiff may assert trade dress infringement for a patented invention was the precise question the Supreme Court considered in *TrafFix Devices.*

"A ... patent, we conclude, has vital significance in resolving the trade dress claim. A utility patent is strong evidence that the features therein claimed are functional. If trade dress protection is sought for those features the strong evidence of functionality based on the ... patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection. Where the ... patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *TrafFix Devices,* 532 U.S. at 29–30, 121 S.Ct. 1255.

Because the recessed eyes have been patented, Aurora must "overcom[e] the strong evidentiary inference of functionality based on the disclosure." *Id.* at 30, 121 S.Ct. 1255. "While a utility patent is strong evidence that the features therein claimed are functional,' [however,] ... it is not dispositive." *Alphaville Design, Inc. v.*

---

**80.** Defendant Ty Inc.'s Surreply re Plaintiff's Motion for Preliminary Injunction ("Surre-ply"), Docket No. 35 (Dec. 9, 2009).

*Knoll, Inc.,* 627 F.Supp.2d 1121, 1133 (N.D.Cal.2009) (quoting *TrafFix Devices,* 532 U.S. at 29, 121 S.Ct. 1255). In overcoming the inference, the plaintiff claiming trade dress protection must prove that the product feature is not "essential to the use or purpose of the article," and that it does not "affect[ ] the cost or quality of the article." *Id.* at 32, 121 S.Ct. 1255. Aurora has presented no evidence that the eyes of its YooHoo toys do not affect the cost or quality of the toys; to the contrary, it has stated that the eyes are a central element of the toys' consumer appeal.

As respects the coloration of the toys, the Supreme Court in *Qualitex* discussed how lower courts had applied the functionality doctrine to product colors. It noted that it had been held that the color green on farm machinery was functional because customers wanted their farm equipment to match; that the color black for outboard boat motors had been held to be functional because black has the special functional attributes of decreasing the apparent size of the motor and ensuring compatibility with many different boat colors; and that courts had found the color blue in fertilizer to be functional because blue indicated the presence of nitrogen. *Qualitex,* 514 U.S. at 170, 115 S.Ct. 1300 (citing *Deere & Co. v. Farmhand, Inc.,* 560 F.Supp. 85, 98 (S.D.Iowa 1982), aff'd, 721 F.2d 253 (8th Cir.1983); *Brunswick Corp. v. British Seagull Ltd.,* 35 F.3d 1527, 1532 (Fed.Cir. 1994); *Nor–Am Chemical v. O.M. Scott & Sons Co.,* 4 U.S.P.Q.2d (BNA) 1316, 1320 (E.D.Pa.1987)). "Also critical to the functionality inquiry is whether exclusive use of the color would be anti-competitive by depleting alternatives or otherwise putting competitors at 'a significant non-reputation-related disadvantage.'" *Sportvision, Inc. v. Sportsmedia Technology Corp.,* No. C 04–03115 JW, 2005 WL 1869350, *5 (N.D.Cal. Aug. 4, 2005) (quoting *Qualitex,*

514 U.S. at 165, 115 S.Ct. 1300). Given that Aurora's entire argument regarding coloration is that the coloration of its toys is inherently non-utilitarian, and given that it is the party that bears the burden of proving nonfunctionality, the court must conclude that Aurora has not shown that it is likely to succeed in proving the nonfunctionality of the toys' coloration. Indeed, Aurora itself insists that the "coloration ... contribute[s] to the products' consumer appeal." [81]

As respects the products' stitching, Aurora once again fails to explain how the stitching on its toys is unusual or unique. Stitching is common in plush toys and serves the highly functional purpose of preventing the plush toy from coming apart.

In sum, Aurora is the party that bears the burden of proving that the aspects of its trade dress for which it seeks protection are nonfunctional, and the party that bears the burden of showing that it is likely to succeed on the merits. Aurora has merely listed attributes of its products that are common to many plush toys and asserted that they are not utilitarian. This does not suffice to carry its burden on nonfunctionality at the preliminary injunction stage.

### 3. Secondary Meaning

▬ "When trade dress is asserted for a product design, the plaintiff is required to show 'acquired meaning' for [the] product design to be eligible for protection by the Lanham Act." *Global Manufacturing,* 417 F.Supp.2d at 1170 (quoting *Wal–Mart,* 529 U.S. at 216, 120 S.Ct. 1339). See also *Computer Access Technology Corp. v. Catalyst Enterprises, Inc.,* No. C–00–4852–DLJ, 2001 WL 34118030, *9 (N.D.Cal. June 13, 2001) ("With respect to the second element, if a trade dress claim involves

---

**81.** Motion at 16.

the design of a product rather than its packaging, the party asserting its rights must establish that the trade dress has acquired secondary meaning").

■ "Secondary meaning is another way of expressing the distinctiveness of a trademark"; the "basic element" is "the mental association by a substantial segment of consumers and potential consumers" with the single source of a product. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir.1985) (en banc). See also *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 614 (9th Cir.1989) ("A plaintiff's trade dress acquires secondary meaning when the purchasing public associates the dress with a particular source"). Thus, secondary meaning attaches "when the purchasing public associates the ... dress with a single producer or source rather than with the product itself." *International Jensen*, 4 F.3d at 824. See also *Art Attacks*, 581 F.3d at 1145 ("To show secondary meaning, a plaintiff must demonstrate 'a mental recognition in buyers' and potential buyers' minds that products connected with the [mark] are associated with the same source,'" quoting *Japan Telecom v. Japan Telecom America*, 287 F.3d 866, 873 (9th Cir. 2002)).

"The courts examine various factors to assess if a 'learned association' exists between the source and the appearance of the product...." Normally, the association "is ... shown by direct consumer testimony that purchasers associate the design with the source." *Global Manufacturing*, 417 F.Supp.2d at 1170 (citing *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999)). See also *Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir.1970) ("The test of secondary meaning is the effectiveness of the effort to create it, and the chief inquiry is directed towards the consumer's attitude about

the mark in question: does it denote to him a single thing coming from a single source?" (internal quotation omitted)).

Courts also consider whether plaintiff's use of the particular design or configuration has been exclusive, *Vision Sports*, 888 F.2d at 615; *Clamp*, 870 F.2d at 517, and the length and manner of advertising and sales figures, *Filipino Yellow Pages*, 198 F.3d at 1151; *Clamp*, 870 F.2d at 517.

A plaintiff may establish secondary meaning through direct and circumstantial evidence. *Continental Laboratory Products, Inc. v. Medax International, Inc.*, 114 F.Supp.2d 992, 999 (S.D.Cal.2000). "Direct evidence, such as consumer surveys and direct consumer testimony, often provides the strongest evidence of secondary meaning.... A plaintiff may also establish secondary meaning through circumstantial evidence, such as: exclusivity, manner, and length of use, amount and manner of advertising, amount of sales and the number of customers, and plaintiff's established place in the market." *Id.* at 1000

"While evidence of a manufacturer's sales, advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the effectiveness of this effort to create it." *International Jensen*, 4 F.3d at 824. For this reason, courts generally credit customer surveys as the strongest evidence of secondary meaning. *Levi Strauss*, 778 F.2d at 1358 ("An expert survey of purchasers can provide the most persuasive evidence of secondary meaning"); *Global Manufacturing*, 417 F.Supp.2d at 1170 ("Evidence such as customer surveys are important because the purpose of the trade dress protection is to protect consumers from confusion or deception; therefore, the purchasing public's perspective is central to the determination of acquired meaning"). Nonetheless, "at the preliminary injunction stage, 'full-

blown consumer surveys or market research are not an absolute prerequisite.'" *Mutual Pharmaceutical Co. v. Watson Pharmaceuticals, Inc.*, No. CV 09–5700 PA (RCx), 2009 WL 3401117, *3 (C.D.Cal. Oct. 19, 2009) (quoting *Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir.2002)).

The Ninth Circuit affords little or no weight to the opinions of those connected with the business that owns the trademark or trade dress, however, including wholesalers, dealers, or other business associates. *Japan Telecom*, 287 F.3d at 870 (because acquired secondary meaning requires a showing of mental recognition by buyers, two incorrectly addressed letters (one from a supplier) and six declarations from business owners were not sufficient evidence to defeat summary judgment); *Filipino Yellow Pages*, 198 F.3d at 1152 (affirming, at the summary judgment stage, a district court's evidentiary ruling that struck portions of the declaration of the founder and president of plaintiff's company as inadmissible and/or lacking in substantial probative value on secondary meaning); *Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 910 (9th Cir.1995) (noting that declarations of employees and wholesalers had "little probative value regarding the assessment of consumer perception," and therefore failed to raise question of material fact sufficient to defeat summary judgment motion); *Outfitters, Inc. v. GM Corp.*, 448 F.2d 1293, 1297 (9th Cir.1971) (testimony from persons closely associated with the trademark owner does not adequately reflect the views of the buying public).

In *Wal–Mart*, the Supreme Court held that to prove secondary meaning in a trade dress actions, plaintiff had to show that "in the minds of the public, the primary significance of a [mark] is to identify the source of the product." *Wal–Mart*, 529 U.S. at 211, 120 S.Ct. 1339. The standard appears to be higher in the case of a product design:

> "In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify source, but to render the product itself more appealing." *Id.* at 213, 120 S.Ct. 1339.

See also *TrafFix Devices*, 532 U.S. at 26, 121 S.Ct. 1255 (approving *Wal–Mart's* statement that product design almost invariably serves purposes other than source identification); *Continental Laboratory Products, Inc. v. Medax International, Inc.*, 114 F.Supp.2d 992, 997 (S.D.Cal.2000) ("Because affording trade dress protection to product designs may hinder legitimate competition, the Ninth Circuit has advised district courts to evaluate such claims with greater scrutiny than claims involving other forms of trade dress," citing *Leatherman*, 199 F.3d at 1012–13).[82]

As evidence that its product design has acquired secondary meaning, Aurora proffers its worldwide sales figures, worldwide and national advertising budget, and three emails that purportedly evidence consumer confusion.[83] At the outset, the court notes that Aurora has not adduced a

---

**82.** "In addition, a plaintiff must show its product acquired this meaning *before* the defendant introduced its competing product." *Global Manufacturing*, 417 F.Supp.2d at 1171 (emphasis original) (citing *Self–Realization Fellowship Church*, 59 F.3d at 910). See also *Braun, Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 826 (Fed.Cir.1992) ("A claim of trade dress infringement fails if secondary meaning did not exist before the infringement began").

**83.** Motion at 17.

consumer survey or expert testimony indicating a likelihood of confusion. Of the three emails submitted, none is from an average consumer, which, under Ninth Circuit precedent, entitles them to little weight. The first, which asks whether Aurora's sales representative "ha[d] seen these from Ty? Total rip off!", is from a commercial toy dealer, not a consumer. See *Japan Telecom*, 287 F.3d at 870. Similarly, the email from the manager of retail operations for the Calgary Zoo has little probative value both in the sense that it is not reflective of consumer perception and in the sense that it does not concern perceptions *in the United States*. This is particularly significant in that Ty represents that it sells certain plush toys in Canada that it does not sell in the United States.[84] Finally, the email from the Ty collectors who run a website dedicated to Ty plush toys might be probative were it not for the fact that the collectors appear to reside in the United Kingdom rather than the United States. Leon and Sondra do not reflect American consumer perceptions, not only because they are located in the United Kingdom, but because they discuss the similarity to Aurora's products of Beanie Boos not sold in the United States. The court need not decide, therefore, whether professional or amateur collectors who manage a website dedicated to one of the two product lines at issue are sufficiently representative of the public's perspective.[85]

Aurora's sales figures, which reflect worldwide rather than national sales, are likewise minimally probative. Aurora's sales of YooHoo & Friends generated $3.0 million in revenue worldwide in 2008, and $4.0 million worldwide through November 2009.[86] None of the evidence Aurora has presented, however, indicates what percentage of these sales were made in the United States. Aurora represents that it has spent approximately $225,000 on U.S. advertising from 2007 through July 2009.[87]

---

84. Wuescher Decl. ¶ 2.

85. In any event, Aurora asserts that its intended market is children. Collectors managing a Ty enthusiast website are in all likelihood not children.

86. Kessler Decl., ¶ 9.

87. *Id.*, ¶ 5. Aurora proffers worldwide advertising figures as well, noting that it spent $274,176 on worldwide advertising from January 2008 to July 2009, and $669,000 creating the YooHoo & Friends animated series that aired abroad. (*Id.*, ¶¶ 6, 8.) Based on this evidence, Aurora's reply cites cases concerning worldwide advertising. In *Conagra, Inc. v. Singleton*, 743 F.2d 1508 (11th Cir.1984), the court mentioned the amount defendant Singleton spent worldwide to promote its name. *Id.* at 1513. This was not dispositive of the case, however, and was only marginally relevant, as the court noted that the fact that the Singleton name had acquired secondary meaning was "hardly in dispute." Indeed, in oral argument, opposing counsel conceded that the name had acquired secondary meaning. *Id.* at 1513 & n. 6. Additionally, there was evidence that Singleton's advertising efforts "were consciously directed at establishing the Singleton mark and its relationship to Singleton Packing's business." With the possible exception of evidence regarding the animated series (which potentially could be said to be directed at brand identification), such evidence is missing here. *Id.* at 1513. In *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 55 F.Supp.2d 1070 (C.D.Cal. 1999), the district court recognized that various of Playboy's magazines had been marketed and distributed in interstate commerce and that one—Playboy Magazine—had been marketed and distributed internationally. *Id.* at 1076. The court found that "[b]ecause of the duration and extent of [plaintiff's] advertising, use and publicity of the trademarks Playboy® and Playmate®, these trademarks have acquired significant recognition and goodwill worldwide, have become inherently distinctive and have acquired secondary meaning." *Id.* at 1077. While *Playboy Enterprises* suggests that worldwide advertising has some relevance, it is clear the evidence showed that a substantial part of that advertising took place in the United States. Finally, in *Playboy Enterprises, Inc. v. Asiafocus*

Aside from attendance at trade shows in Los Angeles, Chicago, Atlanta, and New York City,[88] and the fact that its YooHoo & Friends website has received 54,564 hits in the past two years, 48.8% of which represent first-time visitors,[89] Aurora proffers no evidence regarding the types of advertising or promotion in which it has engaged in the United States. Similarly, and more importantly, it proffers no evidence as to the impact that its advertising has had in the United States. In asking that the court infer that its trade dress has acquired secondary meaning based on circumstantial evidence of advertising activities, Aurora must, at a minimum, present a "coherent explanation as to how the[ ] expenditures contribute to secondary meaning." *Continental Laboratory Products,* 114 F.Supp.2d at 1001–02 (finding evidence of advertising unpersuasive when plaintiff provided "no evidence as to the number of flyers distributed, how they were distributed and who received them"). See also *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1269–70 (7th Cir.1989) (holding that the district court properly granted summary judgment against a trademark plaintiff who proffered evidence that it had placed 25,000 promotional posters on college campuses but failed to adduce evidence as to the amount of time the posters remained up, the number of stu-

dents at various campuses, and other relevant demographic evidence); *McDonald's Corp. v. Burger King Corp.,* 107 F.Supp.2d 787, 790 (E.D.Mich.2000) (concluding that evidence of advertising expenditures did not raise triable issues of fact because it failed to show "that the use was sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of McDonald's or that the use had a substantial impact on the purchasing public").

In short, Aurora has failed to establish either that $225,000 over almost three years constitutes significant advertising expenditures in the relevant market or that the manner in which the $225,000 was spent had an impact on consumers sufficient to establish secondary meaning. Nor has it established that the 26,627 people[90] who have visited its website in two years constitutes significant traffic in the context of the relevant market or that the visits created an impact on consumers sufficient to establish secondary meaning for its mark.

Similarly, Aurora has failed to place its sales figures in a coherent evidentiary context in that it has not proffered evidence of its U.S. sales figures or "evidence [regarding] the size of the relevant market or the market share" it has achieved. *Continen-*

---

*International, Inc.,* No. Civ.A. 97–734–A, 1998 WL 724000 (E.D.Va. Apr. 10, 1998), the court found that the fact that the Playboy mark had acquired secondary meaning "[could not] reasonably be disputed," as they had been promoted "through national and international advertising." *Id.* at *8. As with Playboy's action against Netscape Communications, therefore, it is clear that Playboy presented evidence of national advertising in the *Asiafocus* case. Additionally, as in Conagra's action against Singleton, it is clear that whether the mark had acquired secondary meaning was seriously disputed.

While each of these cases is distinguishable, the court does not mean to suggest that evi-

dence of international advertising is always irrelevant in assessing whether a mark had acquired secondary meaning. Given that the court has determined that exterritorial application of the Lanham Act is not warranted in this case, however, it is clear that the figures that are relevant are advertising and sales figures for the United States, not worldwide advertising and sales figures.

88. *Id.,* ¶ 4.

89. Fitzhugh Supp. Decl., Exh. J.

90. 54,564 visits × 48.8 % first-time visitors = 26,627.

*tal Laboratory Products,* 114 F.Supp.2d at 1003–04. In sum, Aurora has "not attempt[ed] to explain how its alleged sales success has any relationship to the attainment of secondary meaning in the minds of the consuming public." *Id.* at 1004.

The Ninth Circuit's recent decision in *Art Attacks* is instructive. A company that marketed and sold dolls with large eyes, oversized feet and other features contended that its trade dress had acquired secondary meaning because large numbers of people had passed by its booth at county fairs, where the doll was displayed, and visited its website. *Art Attacks,* 581 F.3d at 1145–46. The court held that the evidence adduced did not demonstrate that purchasers linked a product with large eyes and oversized feet, and the other characteristics typical of the dolls with a single source. *Id.* The court observed that it was not the number of people who were exposed to plaintiff's advertising, but the effectiveness of the advertising that was decisive. *Id.* at 1146. As the court noted previously, Aurora has proffered no such evidence here.

For all these reasons, Aurora's evidence that its YooHoo & Friends toys have acquired secondary meaning is not sufficient to permit the court to conclude that it will likely prove this element of its trade dress claim.

#### 4. Likelihood of Confusion

██ Once a plaintiff has shown that its trade dress is entitled to protection, "liability under § 43(a) requires proof of the likelihood of confusion." *Two Pesos,* 505 U.S. at 769–70, 112 S.Ct. 2753 (citing *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir.1987)). "This is 'the core element of trademark infringement.'" *International Jensen,* 4 F.3d at 825. "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the

good or service bearing one of the marks." *Dreamwerks Prod. Group, Inc. v. SKG Studio, d/b/a Dreamworks SKG,* 142 F.3d 1127, 1129 (9th Cir.1998) (footnote omitted). See also *Clicks Billiards,* 251 F.3d at 1265 ("Likelihood of confusion exists when customers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark," quoting *Fuddrucker's,* 826 F.2d at 845).

The Ninth Circuit has identified eight factors that should be considered in assessing likelihood of confusion: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the marks' similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree to which the parties' marketing channels converge; (6) the type of goods and the degree of care customers are likely to exercise in purchasing them; (7) evidence of defendants' intention in selecting and using the allegedly infringing mark; and (8) the likelihood that the parties will expand their product lines. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 349 (9th Cir.1979); see also *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir. 2000) (reciting the eight *Sleekcraft* factors); *Global Manufacturing,* 417 F.Supp.2d at 1173 ("In addition to evidence of actual consumer confusion, courts evaluate several factors to determine whether confusion is likely, including the strength of plaintiff's trade dress; the similarity between the competing products and whether the copying was deliberate; the degree of care consumers devote to selecting the type of product; and the products' market and advertising channels," citing *Clamp,* 870 F.2d at 517).

"The[se] factors should not be rigidly weighed." *Dreamwerks,* 142 F.3d at 1129. Rather, they "are intended to guide the

court in assessing the basic question of likelihood of confusion," *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir.1992). The court need not address all of the factors, nor must plaintiff establish that each weighs in its favor to show likelihood of confusion. See *C & C Org. v. AGDS, Inc.*, 676 F.Supp. 204, 206 (C.D.Cal.1987) (citing *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 526 (9th Cir.1984)). Indeed, some *Sleekcraft* factors are more important in certain contexts than others. See, e.g., *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1054 (9th Cir.1999) ("A word of caution: this eight-factor test for likelihood of confusion is pliant. Some factors are much more important than others, and the relative importance of each individual factor will be case-specific. Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors"); *Dreamwerks*, 142 F.3d at 1130 & n. 6 (noting that three of the *Sleekcraft* factors were "pivotal" and that the remainder did not "provide much insight in this case and thus carr[ied] little weight").

■ "[A]t the preliminary injunction stage, 'the trial court is not required to consider all of th[e] factors' since the record will not likely be sufficient to permit thorough consideration." *Sony Computer Entertainment America, Inc. v. Gamemasters*, 87 F.Supp.2d 976, 984 (N.D.Cal. 1999) (quoting *Apple Computer*, 725 F.2d at 526). At the preliminary injunction stage, plaintiff need only "establish that it is likely to be able to show such a likeli-

hood of confusion." *Brookfield Communications*, 174 F.3d at 1052 n. 15.

### a. Similarity of the Parties' Trade Dress

Aurora's trade dress "claim is, in essence, a repeat of [its] copyright infringement claim." *Alchemy II*, 844 F.Supp. at 570 (using a substantial similarity analysis where plaintiff asserted both copyright and trade dress infringement claims based on its product design). For purposes of its Lanham Act claim, however, Aurora can rely on plush toys for which it does not have a copyright. As respects these toys, the court must determine whether one or more of the Beanie Boos is confusingly similar. The only comparison Aurora offers, however, is a comparison of Ty's Cleo and Bubblegum plush toys and its lemur and bush baby toys.[91] Given the court's conclusion that there is no basis for applying the Lanham Act extraterritorially, the court declines to consider the similarity of Cleo and Bubblegum to any of Aurora's YooHoo toys.

The similarity of the trade dress factor weighs in favor of a finding of infringement when " 'the similarity of the [trade dress] is likely to confuse customers about the source of the products.' " *GoTo.com*, 202 F.3d at 1205 (quoting *Official Airline Guides v. Goss*, 6 F.3d 1385, 1391 (9th Cir.1993)). It is always an important factor in the likelihood of confusion analysis. See *Perfumebay.com, Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir.2007) (" 'The similarity of the marks will always be an important factor. Where the two marks are entirely dissimilar, there is no likelihood of confusion,' " quoting *Brookfield Communications*, 174 F.3d at 1054).

**91.** Motion at 15 ("Looking at the Cleo and Bubblegum Beanie Boos next to Aurora World's YooHoo bush babies the similarities are striking and, as one collector has pointed out, go 'beyond mere coincidence' ").

■ "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft,* 599 F.2d at 351. When judging similarity, trademarks should be considered as they are encountered in the marketplace, taking into account the normal circumstances surrounding purchase of the type of goods they represent. *Id.;* *Nutri/System, Inc. v. Con–Stan Indus., Inc.,* 809 F.2d 601, 605–06 (9th Cir.1987) ("[D]etermination of 'similarity' involves consideration of 'the marks and names in their entirety and as they appear in the marketplace,'" quoting *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 444 (9th Cir.1980)); *Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1245 (9th Cir.1984), cert. denied, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985); *Walt Disney Prods. v. Air Pirates,* 581 F.2d 751, 759 (9th Cir.1978). See also *Moroccanoil, Inc. v. Moroccan Gold, LLC,* 590 F.Supp.2d 1271, 1278 (C.D.Cal.2008) ("[C]ourts should consider [three principles] when conducting the 'similarity' analysis[:] (1) the marks must be considered in their entirety and as they appear in the marketplace, (2) similarity is adjudged in terms of appearance, sound, and meaning, and (3) similarities are weighed more heavily than differences").

■ Aurora does not compare the trade dress of the YooHoo & Friends toys and the Beanie Boos that Ty sells in the United States in any detail. Ty, however, has made a side-by-side comparison of each toy that both parties market and sell in the United States. As respects Aurora's koala plush toy and Ty's Kooky the Koala, the animals have strikingly different coloring,[92] substantially different poses,[93] and different noses.[94] There is some similarity in the koalas' eyes,[95] but the similarities end there. Comparing Aurora's frog toy and Ty's Kiwi Beanie Boo, the two products have few, if any, no similarities other than the fact that both are frogs.[96] Aurora's panda toy and Ty's Bamboo the Panda are similar in the sense that their coloration is closer to a natural panda's than other toys in the respective series. As discussed in connection with the court's copyright analysis, however, the pandas are significantly different in expression,[97] pose,[98] and the manner in which the natural coloring is distributed across their body.[99] Finally, Aurora's penguin toy and Ty's Waddles the Penguin have

---

**92.** Aurora's koala is a bright turquoise, while Ty's koala is a muted gray-blue. (Wuescher Decl., ¶ 6.)

**93.** Aurora's koala appears to be standing with its arms spread wide, while Ty's koala appears to be sitting with its hands clasped and attached so they cannot be separated. Ty's koala is also taller and slimmer. (*Id.*)

**94.** Aurora's koala appears to have a nose made of cloth, while Ty's koala apparently has a plastic nose. (*Id.*)

**95.** The eyes on Ty's koala are fully visible, however, while the eyes of Aurora's koala are hidden by fur and are of a more muted coloring. (*Id.*)

**96.** Aurora's frog is green with yellow feet. Its eyes are almost completely hidden, giving the frog the appearance of being sleepy. The toy

is significantly smaller than Ty's frog. Ty's Kiwi the Frog is green and fluorescent pink with shiny fur. Aurora's frog stands upright on its hind legs. Ty's, by contrast, is on all fours. (*Id.,* ¶ 10.)

**97.** Ty's panda is smiling, while Aurora's appears to be sad.

**98.** Aurora's panda is standing with arms spread apart, while Ty's panda is seated with arms resting. Ty's panda also appears to be slender, whereas Aurora's panda appears to be heavier.

**99.** Much of the lower body of Ty's panda is black. Aurora's panda has one black stripe just below the neck and is otherwise white with gray paws.

significant differences, including coloring and fur.[100] Aurora has no counterpart for Ty's monkey and husky Beanie Boos.

As noted, *Sleekcraft* commands that the court consider "sight, *sound*, and meaning." *Sleekcraft*, 599 F.2d at 351 (emphasis supplied). Each of Aurora's YooHoo & Friends plush toys makes a sound. Ty's Beanie Boo toys do not.

The individual Beanie Boos sold in the United States bear little resemblance to the comparable YooHoo & Friends toys. The primary similarities are those that are inherent in being a depiction of the same animal, this factor weighs against a finding of confusion. *Aliotti*, 831 F.2d at 901 ("Appellants therefore may place no reliance upon any similarity in expression resulting from either the physiognomy of dinosaurs or from the nature of stuffed animals").

### b. Strength of Aurora's Trade Dress

#### i. Distinctiveness

■■■ "The strength of a given mark rests on its distinctiveness." *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir.1988), abrogated on other grounds in *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir.1985) (en banc).

The distinctiveness of trade dress is related to the question of secondary meaning. See *TrafFix Devices*, 532 U.S. at 28, 121 S.Ct. 1255 ("The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design

or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods"). The Supreme Court in *Wal–Mart* offered these observations regarding the distinctiveness of trade dress:

> "It seems to us that design, like color, is not inherently distinctive. The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product. Although the words and packaging can serve subsidiary functions—a suggestive word mark (such as "Tide" for laundry detergent), for instance, may invoke positive connotations in the consumer's mind, and a garish form of packaging (such as Tide's squat, brightly decorated plastic bottles for its liquid laundry detergent) may attract an otherwise indifferent consumer's attention on a crowded store shelf—their predominant function remains source identification.

> \* \* \*

> The fact that product design almost invariably serves purposes other than source identification not only renders inherent distinctiveness problematic; it also renders application of an inherent-distinctiveness principle more harmful to other consumer interests. Consumers

---

**100.** Ty's penguin is white and black, with turquoise eyes, and turquoise coloring on its feet and under its wings. Aurora's penguin has no black coloring, but is dark blue and white, with some light blue coloring around its green eyes. (*Id.*, ¶ 16.) Aurora has since lodged a second penguin that appears to have been created specifically for a particular chain of stores. (Reply, Appx. A; Plaintiff Aurora World, Inc.'s Notice of Lodging Ex-

hibits in Support of Its Motion for Preliminary Injunction, Docket No. 38 (Dec. 10, 2009).) Given that this penguin was specially created and is not described in any other filing or declaration, the court declines to consider it, Aurora does not represent that it is sold in the United States or that it was produced before Ty's penguin entered the marketplace.

should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness." *Wal–Mart,* 529 U.S. at 212–13, 120 S.Ct. 1339. The Court thus concluded that a product design cannot be inherently distinctive unless it has acquired secondary meaning. *Id.*

Because the court has found that Aurora is not, based on the present record, likely to succeed in showing that the design of its YooHoo & Friends toys has acquired secondary meaning, it concludes that Aurora is not likely to prove that its trade dress is inherently distinctive. This factor, therefore, weighs against a finding that Aurora will be able to prove a likelihood of consumer confusion.

### ii. Commercial Strength

" 'Placement on the spectrum of distinctiveness does not end the enquiry as to the strength of a mark: it is only the first step. The second step is to determine the strength of th[e] mark in the marketplace[,] [t]hat is, its degree of recognition in the minds of the relevant customer class.' " *Miss World,* 856 F.2d at 1449 (quoting 1 J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 11:1 (2d ed. 1984)); see also *Petro Stopping Centers v. James River Petroleum, Inc.,* 130 F.3d 88, 93 (4th Cir.1997) (". . . the placement of a mark in either the suggestive or descriptive category is merely the first step in assessing the strength of a mark for purposes of likelihood of confusion test. . . . [C]ourts must examine, in addition to the mark's characterization as suggestive or descriptive, the extent of secondary meaning a mark has acquired in the eyes of consumers"); *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 479 (3d Cir.1994) ("Distinctiveness on

the scale of trademarks is one measure of a mark's strength. . . . Commercial strength, or marketplace recognition of the mark, is another"); *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 975 (11th Cir.1983) (the distinctiveness of the mark and the extent of third party use "both . . . should be considered when analyzing the strength of a particular trademark"); *Sun Banks of Florida, Inc. v. Sun Fed. Savings & Loan Ass'n,* 651 F.2d 311, 315 (5th Cir.1981) (after holding that plaintiff's mark was arbitrary, the court stated: "The ultimate strength of a mark, [however,] the key inquiry before us, is determined by a number of factors which establish its standing in the marketplace"); 2 J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 11.83 (4th ed. 2006) ("While some courts have made the strong-weak evaluation solely upon the place of a term on the spectrum of marks, such an approach is incomplete. One must in addition look at the marketplace strength of the mark at the time of the litigation or at the time registration is sought").

As noted in connection with the court's analysis of secondary meaning, Aurora has not adduced evidence that its mark is commercially strong in the United States market. Most specifically, it has not proffered evidence regarding its U.S. sales, the size of the relevant market or its market share. Similarly, it has not established that its advertising expenditures of $225,000 over almost three years are significant in terms of the market norm, nor that the manner in which the $225,000 was spent caused consumers to identify the product design of YooHoo & Friends with Aurora as the single source of supply. Absent such evidence, the court cannot conclude that Aurora is likely to prove that its trade dress is commercially strong.

### iii. Conclusion Regarding Strength of the Trade Dress

Because Aurora's proof does not demonstrate that it is likely to show either that its trade dress is inherently distinctive or that it is commercially strong, the court concludes that this factor weighs against a finding that plaintiff will likely succeed in proving a likelihood of confusion.

### c. Proximity or Relatedness of the Goods

■ Goods are proximate or related if they "are similar in use and function," and "would be reasonably thought by the buying public to come from the same source if sold under the same mark.'" *Sleekcraft,* 599 F.2d at 348 n. 10, 350 (quoting *Standard Brands, Inc. v. Smidler,* 151 F.2d 34, 37 (2d Cir.1945)); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 159 (9th Cir.1963) ("The use need not be the same as, nor one in competition with the original use. The question is, are the uses related so that they are likely to be connected in the mind of a prospective purchaser"); see also *Brookfield Communications,* 174 F.3d at 1056 (holding that because "both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically," there was sufficient relatedness of goods to support a finding of likelihood of confusion); 4 J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION § 24.24 (4th ed. 2006) ("Goods are 'related' if consumers are likely to mistakenly think that the infringer's goods come from the same source as the senior user's goods or are sponsored or approved by the senior user").

Both Ty and Aurora market small plush toys. Ty does not dispute that the goods sold by it and Aurora are proximate and related. It is likely, therefore, that this factor will weigh in favor of a finding of likelihood of confusion.

### d. Evidence of Actual Confusion

■ Aurora has not adduced any evidence of actual confusion. While such evidence is not necessary to prevail on an infringement claim or to secure injunctive relief, it can be persuasive proof that future confusion is likely. See *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1456 (9th Cir.1991) ("[A]ctual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act"); *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1218 (9th Cir.1987) ("Evidence of actual confusion is strong evidence of likelihood of confusion, but it is not determinative"); *Levi Strauss,* 778 F.2d at 1360 ("The absence of evidence of actual confusion need not give rise to an inference of no likelihood of confusion"); *Golden Door, Inc. v. Odisho,* 646 F.2d 347, 352 (9th Cir.1980) (affirming the grant of an injunction for plaintiff despite the absence of evidence of actual consumer confusion); *Sleekcraft,* 599 F.2d at 352 (proof of actual confusion "is persuasive proof that future confusion is likely").

Aurora presents the three emails discussed earlier as evidence of actual confusion. Ty correctly counters, however, that the very "nature of the question" asked by all three authors indicates that they understand there are at least two different plush toy manufacturers and "that potential customers do not automatically" confuse Beanie Boos with YooHoo & Friends. See *Duluth News–Tribune v. Mesabi Publishing Company,* 84 F.3d 1093, 1098 (8th Cir.1996) ("The question to the reporter who was asked to specify which News–Tribune he worked for indicates a distinction in the mind of the questioner, rather than confusion. See *Fisher Stoves, Inc. v. All Nighter Stove Works,* 626 F.2d 193, 195 (1st Cir.1980) (questions about affiliations of two companies indicate that customers

were aware of different product sources). The nature of the question demonstrates an understanding that at least two newspapers contain the words 'news' and 'tribune.' Likewise, the calls questioning whether the two papers were associated demonstrate that potential customers do not automatically associate the words 'news' and 'tribune' with 'Duluth News–Tribune' ").[101]

101. Even were it to find that the retailers' statements indicated confusion, it is not clear how much relevance such opinions would have. In *Icon Enterprises International, Inc. v. American Products Co.*, No. CV 04–1240 SVW (PLAx), 2004 WL 5644805, *15–17 (C.D.Cal. Oct. 7, 2004), the court offered a thorough analysis of the issue. It explained that "[s]ince '[t]he test for likelihood of confusion is whether a 'reasonably prudent *consumer*' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks,' *Dreamwerks Production Group v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir.1998) (emphasis added), statements by a retailer or distributor that he or she was confused do[ ] not necessarily show confusion by consumers." *Id.* at *15. The court noted, however, that "several circuits and courts ha[d] held that such evidence [was] probative of consumer confusion." *Id.* (citing; *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 16 (1st Cir.2004); *Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1265 (Fed.Cir.1995); *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 384 (7th Cir.1976) *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F.Supp.2d 273, 297 (S.D.N.Y. 2002); and *CSC Brands LP v. Herdez Corp.*, 191 F.Supp.2d 1145, 1152 (E.D.Cal.2001)). Nonetheless, the *Icon Enterprises* court explained, "[t]he Ninth Circuit ... ha[d] never embraced the theory that a showing of actual confusion on the part of retailers or distributors is, *ipso facto*, probative of actual consumer confusion because retailers and distributors, being members of the trade, are less likely to be confused." *Id.* at *16. The court next examined the Ninth Circuit's opinion in *Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 874 (9th Cir.2002), which addressed whether declarations from plaintiff's business partners were relevant to prove that plaintiff's mark had attained secondary meaning. The Ninth Circuit stated: "Although all the declarants claim to have the sort of mental recognition that's characteristic of secondary meaning, Japan Telecom has not come forward with evidence that they formed this recognition for any reason other than their personal relationships with Japan Telecom or its president.

Consequently, their declarations are not persuasive evidence that a significant number of consumers have formed a similar mental association. Had they formed their mental association with Japan Telecom because of some stimulus that was just as likely to affect members of the buying public as it was likely to affect them (such as advertising), their declarations would have been more persuasive." *Id.* at 875 (internal citations omitted)

The *Icon Enterprises* court reasoned that "although it involved the use of actual confusion evidence in a somewhat different context, *Japan Telecom* suggests that the Ninth Circuit is skeptical of the proposition that confusion on the part of dealers is necessarily probative or reflective of consumer attitudes. Rather, *Japan Telecom* suggests that the Ninth Circuit would look to the circumstances giving rise to the dealer's confusion to determine whether, under similar circumstances, an ordinary consumer would be as likely to be confused." *Icon Enterprises*, 2004 WL 5644805 at *17. Employing this approach, the court declined to admit testimony regarding confusion on the part of a retailer because "the circumstances giving rise to his confusion ... [were] not the circumstances under which an ordinary consumer is likely to encounter Defendants' product." *Id.* On the other hand, it admitted evidence of confusion by a different retailer who was "confused after seeing an ad for [the product] in a[ ] catalogue" because "a consumer is likely to encounter Defendants' product in the same context." *Id.*

In the present case, Aurora has provided no detail regarding the circumstances under which the retailers came into contact with Ty's toys. To the extent they saw the toys outside the United States, their view would not be probative of confusion in the United States, because the retailers may well have seen Beanie Boos not sold in the United States. To the extent they saw the toys on a sales sheet, this does not appear probative, as consumers likely encounter Ty's products in person at a store, not via a visual depiction on a sales sheet. In any event, because the emails indicate that the speakers were not confused, and correctly identified the fact the

As noted earlier, it is unclear that any of the emails reflect the views of actual consumers. To the extent they do, however, they confirm that individuals familiar with the plush toy market know there are two separate plush toy manufacturers selling small animal toys. This factor, therefore, weighs against a finding that Aurora will be able to show likelihood of confusion.

### e. Degree to Which the Parties' Marketing Channels Converge

This factor requires the court to consider whether the predominant purchasers of the parties' goods are similar or different, and whether the marketing approaches used resemble each other. See *Gray v. Meijer, Inc.*, 295 F.3d 641, 649 (6th Cir. 2002); see also *Frehling Enterprises, Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1338 (11th Cir.1999) (" 'Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception.' ... This factor takes into consideration where, how, and to whom the parties' products are sold," quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980)).

The parties need not be in direct competition with one another for this factor to weigh in favor of a finding of likelihood of confusion. Similarly, the parties' outlets and customer bases need not be identical; rather, some degree of overlap suffices. *Frehling Enterprises*, 192 F.3d at 1339; see also *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 877 (Fed.Cir.1992) ("An opposer need not establish the sale of both parties' services by the same vendor to show employment of the same trade channels.... Rather,

this factor covers 'similarity and dissimilarity of established, likely-to-continue trade channels.' ... This court does not limit channels of trade to identical stores or agents. Rather a channel of trade includes the same type of distribution channel. For example, this court has held channels of trade identical when products were sold under opposing marks in supermarkets and grocery stores across the country.... An opposer does not have the burden to show sales of an infringing product by a specific chain of supermarkets or agents").

■ Plaintiff's motion states that both Aurora's and Ty's toys "are marketed and sold to retailers, including specialty gift shops and zoos, and both are marketed worldwide and through the Internet." [102] Aurora has proffered no evidence, however, that this accurately describes the marketing channels used by Ty. To the extent Aurora is able to prove this contention, however, it will likely be able to show that the marketing channels factor weighs in favor of a finding of likelihood of confusion.

### f. Degree of Care Exercised by Consumers

■ "It is generally assumed that consumers with expertise or who are buying expensive products or services exercise a greater degree of care when doing so and are thus less easily confused." *Edge Wireless, LLC v. U.S. Cellular Corp.*, 312 F.Supp.2d 1325, 1333 (D.Or.2003) (citing *Brookfield Communications*, 174 F.3d at 1060 ("What is expected of this reasonably prudent consumer depends on the circumstances. We expect him to be more discerning—and less easily confused—when he is purchasing expensive items")). By contrast, "[w]hen dealing with inexpensive

---

toys manufactured by Ty and those manufactured by Aurora, the court need not reach address the issue.

**102.** Motion at 19.

products, consumers are likely to exercise less care, thus making confusion more likely." *Discovery Communications, Inc. v. Animal Planet, Inc.*, 172 F.Supp.2d 1282, 1290 (C.D.Cal.2001) (citing *Brookfield Communications*, 174 F.3d at 1060 and *E. & J. Gallo Winery*, 967 F.2d at 1293).

■ Aurora's only argument regarding this *Sleekcraft* factor is that consumers do not exercise care when purchasing "small, relatively inexpensive toys for children." [103] Ty counters that while the parties' plush toys are not overly expensive,[104] they are not consumable or disposable as are very cheap items, such as cookies. Ty notes that "except where consumers ordinarily exercise virtually no care in selecting a particular type of product (as may be the case with inexpensive disposable or consumable items [such as cookies] ), clarity of

labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration." *Versa Products, Inc. v. Bifold Co.*, 50 F.3d 189, 203 (3d Cir.1995). The court credits Ty's argument that at least some degree of care is exercised when a consumer purchases a plush toy at non-negligible cost.

In addition, Ty notes that each Beanie Boo is sold with and clearly identified by the trademarked Ty heart logo that is attached.[105] Ty's heart logo has been on more than one billion toys sold in the United States in the last ten years alone.[106] On each of the exhibits Ty has submitted, the large heart-shaped logo is prominently attached to the ear, arm, or neck of the plush toy. To the extent this represents the usual placement of the logo, the presence of such a prominent tag bearing Ty's logo negates a claim of confusion.[107] See

---

**103.** Motion at 19.

**104.** Neither party offers any evidence regarding the price of the products.

**105.** In its reply, Aurora appears to argue that because the Ty tag contains a Beanie Boos logo in the upper right portion of the heart, it looks similar to the trademarked YooHoo logo. (Reply at 17.) Neither in its complaint or elsewhere has Aurora claimed trademark infringement on the basis of its YooHoo logo. The court therefore declines to consider the argument, particularly as it was made for the first time in reply.

**106.** Wuescher Decl., ¶ 24.

**107.** In its reply, Aurora contends that Ty's argument regarding hang tags ignores Ninth Circuit law regarding post-sale confusion. (Reply at 16–17.) "The law in the Ninth Circuit is clear that 'post-purchase confusion,' i.e., confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act." *Au–Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1077 (9th Cir.2006) (quoting *Karl Storz Endoscopy–America, Inc. v. Surgical Technologies, Inc.*, 285 F.3d 848, 854 (9th Cir.2002)). Aurora's claim is curious because it is not

that Ty ignores the Ninth Circuit law regarding post-purchase confusion, but that Aurora has failed to present any evidence of such confusion. See *Karl Storz*, 285 F.3d at 855 (holding that evidence of post-purchase confusion among doctors supported a finding of likelihood of confusion); *Au–Tomotive Gold*, 457 F.3d at 1078 (holding that the possibility of post-purchase confusion, without evidence of confusion, left the confusion factor in "equipoise").

The court credits to some extent Aurora's assertion that, because many consumers remove the hang tag after purchase, its confusion-obviating effect is limited. Aurora relies on an exhibit that bears a U.K. hang-tag, which informs the purchaser to remove the tag before giving the toy to a child. (Kessler Decl., Exh. G.) Aurora makes several assumptions based on this evidence. The first is that the same warning is present on U.S. hang tags. If this is the case, Aurora could have presented direct evidence of the fact since it presumably has access to Beanie Boos available in the U.S. market. Second, Aurora presumes that removing the hang tag will eliminate all post-sale confusion because all consumers of the toys are children. The *only* consumers about whom Aurora has presented evidence thus far, however, appear to be adult collectors running the Leon and

*Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304, 310 (2d Cir.1972) ("[T]here is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed").

### g. Defendant's Intent

■ Knowing adoption of a mark closely similar to one used by another is a basis for inferring intent to deceive. See *Official Airline Guides,* 6 F.3d at 1394 ("When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public"); *Nutri/System, Inc.,* 809 F.2d at 606 ("When an alleged infringer knowingly adopts a mark similar to another's, the court examines his good faith and intent in developing and marketing it," citing *Sleekcraft,* 599 F.2d at 354, and *Carson Mfg. Co. v. Carsonite Int'l Corp., Inc.,* 686 F.2d 665, 671 (9th Cir.1981), cert. denied, 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983)); see also *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 286 (6th Cir.1997) ("[T]he use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying").

Without citation of authority, Aurora asks the court to find that Ty intentionally copied its YooHoo & Friends toys because Beanie Boos are "strikingly similar" to the YooHoo toys. In at least one case, a circuit court has held that "in the product configuration context, a defendant's intent weighs in favor of a finding of likelihood of confusion only if intent to confuse or deceive is demonstrated by clear and convincing evidence, and only where the product's labeling and marketing are also affirmatively misleading." *Versa,* 50 F.3d

at 207. The court need not decide whether the Ninth Circuit would adopt the Third Circuit's standard for intent in product design cases because, for reasons already stated, the court does not credit Aurora's assertion that the parties' toys are "strikingly similar." The court does credit the Third Circuit's argument that clear labeling weighs heavily against a finding of intent. See also *Continental Laboratory Products,* 114 F.Supp.2d at 1010 n. 14 ("As a related principle, federal courts have refused to infer secondary meaning from deliberate copying of a product design where the defendant uses a different packaging design or conspicuously displays its own trademarks.... The principle behind these cases is that a court should not infer that the defendant intended to deceive consumers where it made deliberate efforts to prevent source confusion"). The court consequently concludes that Aurora is not likely to prove that this factor weighs in favor of a finding of likelihood of confusion.

### h. Likelihood That the Parties Will Expand Their Product Lines

■ "A ' "strong possibility" that either party may expand [its] business to compete with the other will weigh in favor of finding that the present use is infringing.' " *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n,* 311 F.Supp.2d 1023, 1044 (D.Or.2004) (quoting *Sleekcraft,* 599 F.2d at 354). Neither party contends that this factor is relevant here.

### i. Evaluation of the Factors

■ "To prevail on the ultimate question toward which the *Sleekcraft* analysis is

---

Sondra website. Given the existence of this website, it is not implausible to infer that many of one or both companies' consumers are collectors, who would likely not remove the hang tag following purchase. Aurora's

evidence, moreover, is offered for the limited purpose of rebutting Ty's arguments regarding the consumer's degree of care at the moment of purchase. It is noteworthy that at that point, the hang tag is attached.

directed—the likelihood of confusion of consumers—[plaintiff] must show sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible.' " *M2 Software v. Madacy Entertainment*, 421 F.3d 1073, 1085 (9th Cir.2005) (citing *Murray v. CNBC*, 86 F.3d 858, 861 (9th Cir.1996)). Aurora will likely prove that two of the *Sleekcraft* factors weigh in favor of a finding of likelihood of confusion—i.e., that Ty and Aurora produce related small plush toys, and that their marketing channels converge. It is, by contrast, unlikely to show that any of the remaining six factors, including crucial factors such as the similarity of the trade dress of the parties' products and the strength of Aurora's trade dress, weigh in favor of such a finding. As noted, the factors should not be weighed or applied mechanistically, but used as a guide in assessing likelihood of confusion. See *Dreamwerks*, 142 F.3d at 1129; *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir.2002) ("The list of [*Sleekcraft* ] factors is not a score-card—whether a party 'wins' a majority of the factors is not the point. Nor should '[t]he factors ... be rigidly weighed; we do not count beans," citing *Dreamwerks*, 142 F.3d at 1129).

Applying the factors as *Dreamwerks* directs, the court concludes that Aurora has not made a clear showing that it will be able to prove likelihood of consumer confusion. With respect to the factors that are most significant—i.e., the strength of Aurora's trade dress and the similarity of the parties' trade dress, see *GoTo.com*, 202 F.3d at 1205 (similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis")—

Aurora has failed to adduce evidence that supports its likely confusion claim. Aurora has not demonstrated that it will likely prove its mark is conceptually or commercially strong. Aurora has adduced no evidence that Ty intended to infringe its trade dress or consumers have actually been confused. Nor does Aurora contend that it has plans to expand the market for YooHoo & Friends in a way that will generate future confusion. Aurora's claim regarding the degree of care consumers exercise when purchasing small plush toys is successfully countered by Ty's evidence that it clearly labels its products and that consumers exercise only a small degree of care in buying such items.

As respects the remaining factors—relatedness of the products and convergence of the market channels—While it is probable that Aurora will show they weigh in favor of a finding of likely, this is insufficient to support a finding of likely success on the merits of its Lanham Act claim, given that its evidence concerning the remaining factors falls short.

### D. Likelihood of Success on the Merits on Plaintiff's State Law Claims

#### 1. Statutory and Common Law Unfair Competition

In addition to its federal copyright and trade dress claims, Aurora alleges claims for state law unfair competition under Business & Professions Code § 17200 and California common law.[108] "The legal framework used to analyze these claims is substantially the same as the framework used to evaluate Lanham Act claims under

---

**108.** Section 17200 defines unfair competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...." CAL. BUS. & PROFS. CODE § 17200. The common law tort of unfair competition is narrower, and "is generally thought to be synonymous with the act of 'passing off' one's goods as those of another." *Bank of the West v. Superior Court*, 2 Cal.4th 1254,1263, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992).

federal law." *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 444 F.Supp.2d 1012, 1049 (C.D.Cal.2006). See also *Denbicare U.S.A., Inc. v. Toys R Us, Inc.*, 84 F.3d 1143, 1152 (9th Cir.1996) ("[S]tate common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are substantially congruent to claims made under the Lanham Act" (internal citations and quotations omitted)); *Mallard Creek Industries, Inc. v. Morgan*, 56 Cal.App.4th 426, 434, 65 Cal.Rptr.2d 461 (1997) (analysis for state law trademark infringement is the same as under federal law).

Aurora concedes that the "test for [its] statutory and common law unfair competition claims [under California law] is materially the same as the test for the Lanham Act." [109] As Aurora has not demonstrated that it is likely to succeed on the merits of its Lanham Act claim, it has similarly failed to show that it will likely prevail on its state law unfair competition claims.

### 2. Common Law Misappropriation

 " 'Common law misappropriation is one of a number of doctrines subsumed under the umbrella of unfair competition. It is normally invoked in an effort to protect something of value not otherwise covered by patent or copyright law, trade secret law, breach of confidential relationship, or some other form of unfair competition.' " *City Solutions, Inc. v. Clear Channel Communications*, 365 F.3d 835, 842 (9th Cir.2004) (quoting *United States Golf Association v. Arroyo Software Corp.*, 69 Cal.App.4th 607, 618, 81 Cal.Rptr.2d 708 (1999)).

"The elements of a claim for misappropriation under California law consist of the following: (a) the plaintiff invested substantial time, skill or money in developing its property; (b) the defendant appropriated and used plaintiff's proper-

ty at little or no cost to defendant; (c) the defendant's appropriation and use of the plaintiff's property was without the authorization or consent of the plaintiff; and (d) the plaintiff can establish that it has been injured by the defendant's conduct." *Arroyo*, 69 Cal.App.4th at 618, 81 Cal.Rptr.2d 708.

Aurora's theory with respect to its misappropriation claim is that "[i]n manufacturing and selling the strikingly similar Beanie Boos, Ty has appropriated and used Aurora World's intellectual property." [110] By its very nature, such a claim is dependent on a finding that Aurora has intellectual property rights in the plush toys that it sells. The court has concluded that Aurora is not likely to prove that it has certain of the intellectual property rights it claims, and that it is not likely to prove that Ty infringed the copyrights and any protectable trade dress that exists. Having found that Aurora has not demonstrated that it is likely to succeed on the merits of these claims, the court similarly concludes that it is unlikely to succeed on the merits of its common law misappropriation claim.

### E. Irreparable Harm

In its attempt to show irreparable harm, Aurora relies principally on the presumption employed in the Ninth Circuit that a plaintiff who demonstrates a likelihood of success on the merits of a copyright or trademark infringement claim is entitled to a presumption of irreparable harm. *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir.1999) (citing *Cadence Design Systems v. Avant! Corp.*, 125 F.3d 824, 826–27 (9th Cir.1997)). See also *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1155–56 (9th Cir.2006) ("A copyright holder seeking a

---

**109.** Motion at 20.

**110.** Motion at 20–21.

preliminary injunction is therefore not required to make an independent demonstration of irreparable harm"). This presumption accords little, if any, weight to the balance of hardships where plaintiff has made a strong showing of likely success on the merits. *Sun,* 188 F.3d at 1119 (citing *Cadence,* 125 F.3d at 830 (internal quotations omitted)).

Ty questions the continuing validity of the presumption given the Supreme Court's decision in *Winter.* The *Winter* Court held that the Ninth Circuit's standard that a possibility of irreparable injury suffices if plaintiff makes a strong showing of likely success on the merits was too lenient and concluded that the plaintiff must demonstrate that irreparable injury is *"likely* in the absence of an injunction." *Winter,* 129 S.Ct. at 375 (emphasis original). Following *Winter,* several district courts in the Ninth Circuit have found that the presumption is no longer valid. *Jacobsen v. Katzer,* 609 F.Supp.2d 925, 936 (N.D.Cal.2009) (copyright plaintiff). See also *Mortgage Electronic Registration Systems, Inc. v. Brosnan,* No. C 09–3600 SBA, 2009 WL 3647125, *8 (N.D.Cal. Sept. 4, 2009) (stating in a trademark infringement case that "the Supreme Court's decision in *Winter* has effectively eliminated that presumption"); *Gowan Co., LLC v. Aceto Agricultural Chemicals,* No. CV–09–1124–PHX–JAT, 2009 WL 2028387, *4 (D.Ariz. July 10, 2009) ("The Supreme Court's more recent decision in *Winter* and the Ninth Circuit's ruling in *American Trucking* further confirmed that irreparable harm should no longer be presumed," citing *Jacobsen,* 609 F.Supp.2d at 925); *Nampa Classical Academy v. Goesling,* No. 09–cv–427–EJL, 2009 WL 2923069, *2 (D.Idaho Sept. 10, 2009) ("No longer are plaintiffs granted the presumption of irreparable harm upon a showing of a likelihood of success on the merits"); *Maxim Integrated Products, Inc. v. Quintana,* 654 F.Supp.2d 1024, 1030 (N.D.Cal.2009)

("Thus, a plaintiff is no longer entitled to a presumption of irreparable harm on the ground that it has shown a likelihood of success on the merits").

Although Ty relies on *Winter,* the court finds the Supreme Court's holding in *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), more pertinent. In *eBay,* the Supreme Court held that the Federal Circuit erred in adopting a categorical rule that permanent injunctive relief was available once a patentee established the validity of its patent and infringement by defendant. *Id.* at 392–94, 126 S.Ct. 1837. *eBay* involved a permanent injunction; nonetheless, "it has been applied to preliminary, as well as permanent, injunctions, and has been read to limit the presumption of irreparable harm [based] solely upon the finding of infringement." *Hologic, Inc. v. Senorx, Inc.,* C 08–133 RMW, 2008 WL 1860035, *15 (N.D.Cal. Apr. 25, 2008) ("[I]t does not appear that presumption of irreparable harm should be extended to preliminary injunction applications involving patents"); *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.,* 518 F. Supp.2d 1197, 1214 (C.D.Cal.2007) (finding that there was no presumption of irreparable harm in a copyright case); *Chamberlain Group, Inc. v. Lear Corp.,* C 05–3449, 2007 WL 1017751, *5 (N.D.Ill. Mar. 30, 2007) (citations omitted); see also *Seitz v. Envirotech Sys. Worldwide Inc.,* CV H 02–4782, 2007 WL 1795683, *2 (S.D.Tex. June 19, 2007) (recognizing that *eBay* "clarified the standard for issuing a[ ] [preliminary] injunction in a patent case," and that now "[a] court cannot automatically issue an injunction based on infringement allegations," but must instead independently consider, *inter alia,* whether the movant "has suffered an irreparable injury"); *Torspo Hockey Intern., Inc. v. Kor Hockey Ltd.,* 491 F.Supp.2d 871, 881 (D.Minn.2007) ("[Counter-claimant] argues that if it has

established a likelihood of success on the merits, it is entitled to a presumption of irreparable harm. [It] cites various pre-2006 Federal Circuit cases to support its position. In light of the Supreme Court's decision in *eBay[ ]*, the Court finds that it may not presume that a patentee who is likely to succeed on the merits at trial will suffer irreparable harm in the absence of a preliminary injunction"); *Erico Int'l Corp. v. Doc's Marketing, Inc.*, No. CV 05–2924, 2007 WL 108450, *7 (N.D.Ohio. Jan. 9, 2007) ("In *eBay*, the Supreme Court held that traditional principles of equity generally applied in determining whether it is appropriate to issue a permanent injunction *apply with equal force in patent cases.* As such, the Court instructed that the Federal Circuit cannot alter the traditional standard. While *eBay* involved a permanent injunction specifically, the Court did not limit its holding to that context; the Court's reasoning likely applies with even

greater force at the preliminary injunction stage" (emphasis original)); *Canon, Inc. v. GCC Int'l Ltd.*, 450 F.Supp.2d 243, 254 (S.D.N.Y.2006) ("The Supreme Court's decision in *eBay[ ]* makes plain that the mere fact that the Patent Act describes 'the right to exclude others from making, using, offering for sale or selling the invention,' does not mean that an application for a[ ] [preliminary] injunction in a patent case is exempt from the 'traditional principles of equity.' Consistent with those equitable principles, the movant must demonstrate the likelihood of irreparable injury in the absence of a grant of the requested injunction" (citation omitted)).[111]

The *eBay* holding is not limited to patent cases; indeed, the Ninth Circuit has applied it in a trademark case. See *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1137 (9th Cir.2006) (discussing *eBay* in the context of a motion for permanent injunction).[112] In addition, the *eBay*

**111.** Following *eBay*, the Federal Circuit expressly declined to address whether the presumption of irreparable harm continued to apply in the context of a motion for preliminary injunction. See *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 n. 9 (Fed. Cir.2006). Absent definitive guidance from the Ninth Circuit on this issue, the court finds persuasive the reasoning of numerous district courts that have disregarded the presumption in preliminary injunction proceedings. As Judge O'Malley recognized in *Erico International Corp.*, "the [*eBay*] Court did not limit its holding" to permanent injunctions, and the Court's "reasoning likely applies with even greater force at the preliminary injunction stage." 2007 WL 108450 at *7. This is because entitlement to a permanent injunction requires a showing of *actual* success on the merits rather than merely a showing of *likelihood* of success on the merits. See *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success");

accord *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed.Cir.2004). If irreparable harm cannot be presumed in the case of a trademark or copyright holder who has conclusively demonstrated to the trier of fact that his mark or trade dress has been infringed, *a fortiori* it should not be presumed in the case of a trade dress holder who has shown only likely infringement based on the under-developed factual record available at the preliminary injunction stage.

**112.** But see *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir.2009) ("In evaluating irreparable harm, the [district] court cited Ninth Circuit law holding that '[i]n a trademark infringement claim, "irreparable injury may be presumed from a showing of likelihood of success on the merits." ' *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir.2003) (quoting *GoTo.com* [ ], 202 F.3d [at] 1205[ ]). Because the court found a likelihood of success on the merits, it reasonably presumed irreparable injury"). The *Marlyn* court appeared to apply *Winter* and did not consider the impact of the Supreme Court's decision in *eBay*.

Court itself, in dicta, compared its holding in a patent case to copyright cases and stated that it had "consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *eBay*, 547 U.S. at 393, 126 S.Ct. 1837.

■ Having concluded that Aurora is not entitled to invoke a presumption of irreparable harm, the court must examine whether it has demonstrated a probability that it will suffer irreparable harm if an injunction does not issue. Aurora argues that it is entitled to injunctive relief because Ty's alleged infringement will lead to lost sales and because Aurora has a "moral right" to preserve the integrity of its work, reputation and good will. This argument is unavailing for two reasons. First, by failing to proffer evidence regarding YooHoo & Friends' penetration into the U.S. market, Aurora has failed to demonstrated that it has significant reputation or goodwill to protect in that market. The mere fact that Aurora has spent $225,000 on advertising over almost three years, taken alone, does not prove that it has such an interest. *Reebok Intern. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir.1994) (holding that plaintiff had failed to prove the loss of a reputation interest because it "provided no evidence on the extent of such sales"); *Apple Inc. v. Psystar Corp.*, 673 F.Supp.2d 926, 929–30 (N.D.Cal.2009) (quoting *DFW Metro Line Servs. v. Southwestern Bell Telephone Co.*, 901 F.2d 1267, 1269 (5th Cir.1990) (denying a preliminary injunction where plaintiff was only in business for one and a half years and any injury could be calculated and recompensed in the form of damages)).

To the extent Aurora relies on lost sales, moreover, its reliance is misplaced. Loss of sales alone will not support a finding of irreparable injury "because acceptance of that position would require a finding of irreparable harm to every" plaintiff regardless of circumstances. *Reebok*, 32 F.3d at 1558. Similarly, potential loss of market share does not constitute irreparable injury. See *Oakland Tribune, Inc. v. Chronicle Publishing Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir.1985) ("Plaintiff [newspaper] initially claims injury because it will lose circulation and revenue, but as plaintiff seems to admit, this involves purely monetary harm measurable in damages"). As respects Aurora's argument that lost sales will be difficult to calculate, the court cannot evaluate the validity of the argument as Aurora has presented no evidence regarding its U.S. sales figures, potential lost sales in the United States, or any evidence suggesting that sales are being lost to Ty. Indeed, because the two Ty toys upon which Aurora principally relies—the Cleo and Bubblegum toys—are not sold in the United States, it is not clear that there *is* any potential for lost U.S. sales, calculable or otherwise.[113]

**F. Balance of Hardships and Public Interest**

■ "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.*, 480 U.S. at 542, 107 S.Ct. 1396. See also *International Jensen*, 4 F.3d at 827 ("In evaluating the balance of hardships a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises"). In addition, the court "must consider the public interest as a factor in balancing the hardships when the public interest may be affected," *Caribbean Marine Services Co.*

---

**113.** The court further notes that with respect to the argument regarding the display racks

*v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988).

■ To demonstrate that the balance of hardships tips in its favor, Ty proffers the declaration of its chief financial officer, who states that an injunction would prevent Ty from selling Beanie Boos in the United States, interfere with its relationship with its customers, and tarnish its reputation.[114] Ty has adduced some evidence that it has a reputation interest in the Untied States; U.S. customers have purchased more than one billion plush toys bearing the Ty label in ten years.[115] The primary toys that Aurora asserts are confusingly similar, however, are toys that Ty does not presently sell in the United States. As any injunction would have to be directed toward toys sold in the United States, and as Aurora has adduced scant evidence that any U.S. market products are confusingly similar, an injunction would work a hardship on Ty, because it would preclude the sale of products that do not appear to infringe. For the same reason, i.e., because the toys Ty currently sells in the United States do not appear to be confusingly similar, Aurora has not established that it will suffer irreparable harm if Ty is permitted to continue its current U.S. sale activities.

"The likelihood of confusion to consumers is [a] critical factor in our consideration" of the harm to the public. *Milon–DiGiorgio Enterprises,* 559 F.3d at 995 n. 5. "The public has an interest in avoiding confusion between two companies' products." *Id.* Where there is no finding of likelihood of confusion, however, "an injunction [ ] depriv[es] consumers of a choice of products." *International Jensen,* 4 F.3d at 827. In the absence of a finding of likelihood of confusion, there-

fore, the interest of the public weighs against entry of an injunction.

## III. CONCLUSION

For the foregoing reasons, Aurora's motion for preliminary injunction is denied.

114. Declaration of Richard L. Jeffrey Pursuant to 28 U.S.C. § 1746 in Opposition to Aurora World, Inc.'s Motion for Preliminary Injunction ("Jeffrey Decl."), Docket No. 19 (Dec. 2, 2009) ¶ 5.

115. Opp. at 23; Wuescher Decl., ¶ 24.